# LOCHREN
*v.*
## THE UNITED STATES, ex rel LONG.

### PENSIONS; MANDAMUS.

1. The writ of *mandamus* will not issue where there is another plain legal remedy; and a pensioner before resorting to *mandamus* to compel certain action by the Commissioner of Pensions should first exercise his right of appeal to the Secretary of the Interior from the ruling of the Commissioner.

2. Whether in order to give the courts jurisdiction by *mandamus* in such a case the Secretary can waive the exercise of such right of appeal, *quære.*

3. The Commissioner of Pensions has the power to review and modify the decision of a former Commissioner whereby the rating of a pensioner was increased, and to reduce such rating upon the ground that the proof of disabilities submitted did not entitle the pensioner to such increased rating.

4. The exercise of such power by the Commissioner of Pensions is a matter of judgment and discretion in the discharge of his official duties, over which the courts have no control by *mandamus.*

No. 434. Submitted May 16, 1895. Decided June 6, 1895.

HEARING on an appeal by the Commissioner of Pensions from a judgment directing a writ of *mandamus* to issue to compel the vacation of an order reducing petitioner's pension. *Reversed.*

The COURT in its opinion stated the case as follows :

This is an appeal from a judgment directing a writ of *mandamus* to issue to the respondent, William Lochren, Commissioner of Pensions, commanding him to vacate and reverse an order made by him reducing the pension of the relator, Charles D. Long, from $72 per month to $50 per month.

The petition was ordered dismissed as to Hoke Smith, Secretary of the Interior.   The facts set forth in the petition and return, together with the statutes referred to, may be substantially stated as follows :

Charles D. Long, a private soldier, was severely wounded in the battle of Wilmington Island, Georgia, April 16, 1862.   A shot in the left arm necessitated its amputation above the elbow.   Another was received about the point of the left hip, the ball passing through the bone and lodging, it is supposed, somewhere in the right groin.   The wound has never healed, constantly discharges pus and requires to be dressed at least twice in every twenty-four hours.   Having but one arm he cannot dress the wound properly and that service has to be performed by others.   His general health has not been affected and he walks about with the use of a cane.   Having been honorably discharged from the army, relator returned to his home in Michigan, studied law, and was admitted to the bar.   About January 1, 1888, he became a judge of the Supreme Court of Michigan, a position which he still holds in the active discharge of his duties.

Relator's first application for a pension was made July 16, 1862, under the act of that year, and described his wounds in the arm and abdomen fairly.   This was granted, and on February 28, 1863, he entered upon the receipt of $8 per month which was the amount allowed a private soldier for an unspecified " total disability," ordinarily called a " total."

The act of June 6, 1866, established the following rates of pensions :

1. For those who had lost both eyes or both hands, and those otherwise so permanently and totally disabled as to render them utterly helpless, or so nearly so as to require the constant personal aid and attendance of another person, $25 per month.

2. For those who had lost both feet, or one hand and one foot, or were otherwise so disabled as to be incapacitated from performing manual labor, but not so much as to require constant personal aid and attendance, $20 per month.

3. For those who had suffered the loss of one hand or one foot, or had been permanently disabled in the same, $15 per month.

On July 31, 1866, relator made an application for an increase to $15 per month under the foregoing statute, and again described the amputation of his arm, as well as the wound in the left hip, which he said " has never healed and causes deponent great discomfort." The increase for the loss of the hand was duly made. The act of June 8, 1872, made some changes in the specification of disabilities in the foregoing act and increased the rates therein to $31.25, $24 and $18 per month, respectively, and relator on August 10, 1872, applied for and received the increase to $18 per month for the loss of his hand.

The next act of Congress, in order, is that of March 3, 1873, found in sections 4697 and 4698, R. S. The first section of this act provides, for certain classes of pensions, certain rates to commence July 4, 1864, and run to June 3, 1872. The second makes an increased rate from and after June 4, 1872, for certain classes. Among these those " who shall have lost the sight of both eyes, or shall have lost the sight of one eye, the sight of the other having been previously lost, or shall have lost both hands, or shall have lost both feet, or been permanently and totally disabled in the same, *or otherwise so permanently and totally disabled* as to render them *totally helpless,* or so nearly so as to require the regular personal aid and attendance of another

person, shall be entitled to a pension of $31.25 per month; and all persons who, under like circumstances, shall have lost one hand or one foot or been totally and permanently disabled in the same, or otherwise so disabled as to be incapacitated for performing any manual labor, but not so much as to require regular personal aid and attendance, shall be entitled to a pension of $24 per month." Another class, "otherwise so disabled as to render their incapacity to perform manual labor equivalent to the loss of a hand or foot," were to have $18 per month.

Another part of the same act (sec. 4698½), provides: "Except in cases of permanent specific disabilities, no increase of pension shall be allowed to commence prior to the date of the examining surgeon's certificate establishing the same, made under the pending claim for increase, and in this, as well as all other cases, the certificate of an examining surgeon, or of a board of examining surgeons, shall be subject to the approval of the Commissioner of Pensions."

An act of June 18, 1874, to take effect from 4th of the same month, provided that all who were then entitled to pensions under existing laws, and who shall have lost either an arm at or above the elbow, or a leg at or above the knee, shall be rated in the second class and receive $24 per month.

Another act of June 18, 1874, dating also from the 4th, reads as follows:

AN ACT to increase the pension of soldiers and sailors who have been totally disabled.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section four of the act entitled "An act to revise, consolidate, and amend the laws relating to pensions," and approved March third, eighteen hundred and seventy-three, be so amended that all persons who, while in the military or naval service of the United States, and in the line of duty, shall have been so permanently and totally disabled as to require the regular personal aid and attendance of another person, by the loss of the sight of both eyes or by the loss of the sight

of one eye, the sight of the other having been previously lost, or by the loss of both hands, or by the loss of both feet, or by any other injury resulting in total and permanent helplessness, shall be entitled to a pension of fifty dollars per month ; and this shall be in lieu of a pension of thirty-one dollars and twenty-five cents per month granted to such person by said section : *Provided,* That the increase of pension shall not be granted by reason of any of the injuries herein specified, unless the same shall have resulted in permanent, total helplessness, requiring the regular personal aid and attendance of another person.

Relator made no application for increase under the act of March 3, 1873, or under the second of the acts of June 18, 1874, above recited, but did apply for and receive an increase to $24 per month for the loss of an arm above the elbow as provided in the first of said acts of June 18, 1874.

By act of June 17, 1878, the pensions of all who had lost either both hands, or both feet, or the sight of both eyes, were increased to $72 per month, and on June 16, 1880, it was further enacted that the pensions of all who are " now receiving a pension of $50 per month" shall be increased to $72.

On August 15, 1881, relator made an application for increase, without specifying the particular statute under which he claimed the same, in which he referred to his certificate at the $24 rate, and based his claim for the increase on the wound in his hip, of which he said : " Said wound has never healed and requires bandaging and dressing every day and has every day since it was received, discharging frequently to such an extent as to stain through dressing and bandage and clothing, and causing shrinking of the hip, and at times much lameness and soreness of the left hip." This application was denied by Commissioner Dudley October 18, 1881.

The act of March 3, 1883, gave to all who " shall have lost an arm at or above the elbow, or a leg at or above the knee, or shall have been otherwise so disabled as to be incapacitated for performing any manual labor, but not so much as to require regular personal aid and attendance," a pen-

sion of $30 per month.   On March 21, 1883, relator made application thereunder and received the increase to $30.

March 13, 1884, relator wrote a letter to a member of the examining board of the Pension Office in which he said he was entitled to an additional $20, or possibly $42 per month, on account of the hip wound, the necessity for assistance in dressing it being fully stated.   This was followed with affidavits of members of his family and others showing that the wound had never ceased to run, and that it needed dressing and bandaging twice within every twenty-four hours, and that by reason of the loss of his arm, relator could not attend to it himself.   This dressing was done by others for him.   Upon this application and accompanying proof, a certificate was issued for an increased pension of $50 per month, commencing from March 21, 1884. This date of commencement was given because the Commissioner did not consider this a case of "permanent specific disability," under section 4698½, *supra*, and hence it could not date prior to the date of the examining surgeons' certificate.   Relator, acknowledging the receipt of the certificate for $50 per month, wrote to Commissioner Dudley, August 30, 1884, making a protest, as stated, to save any rights he might have for rehearing, on the ground that he was entitled to draw at that rate from the date of the act of 1874, or at least from the date of his last application, August, 1881, which had been denied by the same Commissioner.

No further action appears to have been taken until May 6, 1889, when Commissioner Tanner rescinded the order of Commissioner Dudley, and issued a certificate to relator increasing his pension to $72 per month, and also giving him arrearages at the rate of $50 per month from June 4, 1874, to June 17, 1878, and at the rate of $72 per month from June 17, 1878, to May 6, 1889.

On August 16, 1889, a further allowance was made of $25 per month from June 6, 1866, to June 4, 1872, and from thence to June 4, 1874, of $31.25 per month.

It appears that Commissioner Lochren, the respondent herein, in 1893, undertook to reduce relator's pension, but a *mandamus* was issued by Mr. Justice BRADLEY, of the Supreme Court of the District, who also rendered the judgment appealed from, compelling him to reinstate relator in his former rating. No appeal was taken from this because, as respondent says, of the provisions of the act of December 21, 1893, respecting notice in such cases. A bill for an injunction filed by relator against further action in his case by Commissioner Lochren was sustained by Mr. Justice Cox, of the same court, on the ground of the want of sufficient notice under said statute, but in his opinion the respondent's construction of the law applying to the relator's case was sustained.

This act of December 21, 1893, is to be found in the general appropriation act and reads as follows:

"That any pension heretofore or that may hereafter be granted to any applicant therefor under any law of the United States authorizing the granting and payment of pensions on application made and adjudicated upon shall be deemed and held by all officers of the United States to be a vested right in the grantee to that extent that payment thereof shall not be withheld or suspended until, after due notice to the grantee of not less than thirty days, the Commissioner of Pensions, after hearing all the evidence, shall decide to annul, vacate, modify, or set aside the decision upon which such pension was granted. Such notice to grantee must contain a full and true statement of any charges or allegations upon which such decision granting such pension shall be sought to be in any manner disturbed or modified."

Afterwards, on March 16, 1894, the respondent, as Commissioner of Pensions, sent the following notice to relator:

"You are hereby notified that it appears from the evidence in your case on file in this bureau that your pension of seventy-two dollars per month which you are now receiving is illegal, and that you never were and are not now

entitled under the law to that rating, nor to any rating in excess of fifty dollars per month.

" It is hereby alleged that it appears by the evidence filed in your claim for pension and your various claims for increase of pension in this bureau that your injuries and disabilities never resulted in permanent and total helplessness, requiring the regular aid and attendance of another person, within the meaning of any of the statutes relating to pensions. It is further hereby alleged that in fact you never have been and are not now in such a state or condition of helplessness.

" It is further hereby alleged that you have been at all imes since before your present pension certificate was issued and are now in the daily and active personal performance of your official duties and avocations, and are in nowise hindered therefrom by or because of any of the injuries or disabilities for which you are pensioned.

" You are further notified that you may within thirty days after the day of the service of this notice upon you file in the Bureau of Pensions, at Washington, D. C., such further evidence in support of your right to pension at the rate you are now receiving or having a tendency to controvert any of said allegations as you may desire to present.

" You are further advised that on the Monday next following the expiration of the said period of thirty days after the service of this notice upon you, at 11 o'clock in the forenoon, at the room of the Commissioner of Pensions in the Pension Office building, at Washington aforesaid, the Commissioner of Pensions will consider the allegations and all the evidence on file or which may be presented relative to such allegations or to your claim or right to pension, and will at the same time hear you personally or by counsel and consider any argument which you may submit, and will thereupon proceed to determine the truth of such allegations and to take such final action in respect thereto and in respect to the fixing the rate of pension to which you may appear to be entitled, and to modify, change or affirm your

present rating, as may seem conformable to law and the evidence so to be considered."

Relator seems to have taken no notice of this communication, and on May 1, 1894, respondent sent him a certificate showing that he was entitled to a pension at $50 per month, "issued in lieu of certificate dated August 16, 1889, to correct rate," and wrote him that the pension agent at Detroit would forward him properly prepared vouchers, &c., for the new rate.   It was to vacate this order that relator's petition was filed.   There is no pretense that the relator has ever made any misrepresentation of the character and condition of his wounds.

Commissioner Tanner, reversing the ruling of Commissioner Dudley, concluded that relator's injuries resulted in "permanent, total helplessness, requiring the regular personal aid and attendance of another person" under the act of June 18, 1874 (see same set out above), and that it was a case of "permanent specific disability" under section 4698 ½ R. S., which did not require the surgeon's certificate, and hence could date back.

Respondent claims that the fact of relator's ability to discharge the onerous duties of his judicial position was not before Commissioner Tanner and that he acted solely upon the record before Commissioner Dudley.

Respondent, claiming the right to inquire into the case, and with this additional information, concluded that his case was not that of a "permanent specific disability," and that his injuries had not resulted in "total helplessness" in the sense of the act giving the pension of $72 per month therefor, and revoked the allowance of that sum for the future.   The new certificate for $50 per month was issued under the act of July 14, 1892, which gave that sum to those shown to be "totally incapacitated for performing manual labor," &c., &c., "and who are thereby disabled to such a degree as to require frequent and periodical, though not regular and constant, personal aid and attendance of another person."

The Secretary of the Interior, against whom the petition has been dismissed, made answer that no appeal had ever been taken to him in the relator's case, and that he had no knowledge of the matter until after the first proceeding by *mandamus;* and that supposing no appeal would ever be taken he has since formed and expressed opinions with respect to the merits of relator's case. (What these are is not stated). He then proceeds to say that this failure to appeal renders the proceeding premature as to him, but that he "presents the fact solely for the purpose of affecting his own connection with the proceeding and not for the purpose of affecting an immediate proceeding against the Commissioner, which, so far as it is affected by the failure of relator to file his appeal to the Secretary, is expressly waived."

*Mr. Edward B. Whitney,* Assistant Attorney-General of the United States, for the appellant:

1. Restoration of a pension is not a ministerial act directed by any statute, and therefore it can not be compelled by *mandamus.*

In *State of Mississippi* v. *Johnson,* 4 Wall. 475, 498, 499, Chief Justice CHASE said: "A ministerial duty, the performance of which may in proper cases be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under circumstances admitted or proved to exist and imposed by law."

These principles are recognized in all the *mandamus* cases from *Decatur* v. *Paulding,* 14 Pet. 497, to the present time. The absolutely ministerial character of the acts, in the only three cases (*Kendall* v. *United States,* 12 Pet. 524; *United States* v. *Schurz,* 102 U. S. 378; *Butterworth* v. *Hoe,* 112 U. S. 50) where the writ has actually been allowed by the United States Supreme Court, has been pointed out by this court in *Seymour* v. *South Carolina,* 2 App. D. C. 240.

This writ is asked not to compel an act required by statute to be performed, but to reverse an act already performed which relator claims to be contrary to the statute. Relator here confuses the spheres of law and equity. The legal remedy by *mandamus* and the equitable remedy of injunction are not concurrent, but correlative, as exercised against executive officers of the Government. They are alike in that they can not in any way revise executive discretion. A *mandamus* may be granted to compel an act in nowise discretionary. An injunction may be granted to restrain an officer from overstepping altogether the limits of his jurisdiction and exercising discretion in a sphere where no discretion is given him. The spheres of the two remedies are, however, distinct and complementary to each other. One is positive, the other negative. One compels an act, the other restrains it. *Gaines* v. *Thompson*, 7 Wall. 347.

2. Commissioner Lochren followed the plain meaning of the statute when he held that relator's case did not come within it. The statute covers only cases of " total helplessness." Relator is certainly not totally helpless in the ordinary meaning of the English language. He supports himself handsomely by his own labor.

3. Relator's contention involves a concession that the statute is ambiguous. This is shown by the elaborate opinion of Mr. Justice BRADLEY, invoking the aid of prior statutes in *pari materia*. For the court has no right to make such use of a prior statute, unless there is ambiguity in the statute to be construed. This is the case even with revisions. *United States* v. *Bowen*, 100 U. S. 508, 513; *Dwight* v. *Merritt*, 140 U. S. 213, 217; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1. " When the meaning of a statute is plain * * * there is no necessity for construction." *Thornley* v. *United States*, 113 U. S. 310, 313. The mere fact that Mr. Justice Cox construes the statute one way, while Mr. Justice BRADLEY construes it another, would seem sufficient ground for the conclusion that it contains an ambiguity.

4. If the statute is ambiguous it is Commissioner Lochren's duty to construe it, and his decision is not reviewable by writ of *mandamus*. *United States ex rel. Dunlap* v. *Black*, 128 U. S. 40; *Miller* v. *Raum*, 135 U. S. 200; *United States* v. *Lynch*, 137 U. S. 280, 286 ; *State of Mississippi* v. *Durham*, 4 Mackey, 235. Numbers of authorities to similar effect are cited in *Seymour* v. *South Carolina*, 2 D. C. App. 240 ; *International Contracting Co.* v. *Lamont*, *id.* 532 ; 155 U. S. 303. In the former case it was pointed out that only three writs of *mandamus* against executive officers have actually received the sanction of the Supreme Court of the United States.

That ambiguity in the statute bars this relief as against executive officers is well settled. *Bayard* v. *White*, 127 U. S. 246 ; *Redfield* v. *Windom*, 137 U. S. 636.

5. Hence, if Commissioner Lochren had the right to examine relator's case at all, his decision thereupon is not here reviewable. And this is so for a further reason also. As above stated, the act must be ministerial and not executive to be subject of *mandamus*. One of the tests is the nature of the evidence upon which relator's case depends. If, as here, it depends not alone upon documents, but in part upon oral statements or affidavits, then it calls for executive discretion, and not merely for a ministerial act. *United States* v. *Seaman*, 17 How. 225 ; *United States* v. *The Commissioner*, 5 Wall. 563 ; *The Secretary* v. *McGarraghan*, 9 Wall. 298. His decision, however, is plainly correct and Commissioner Tanner's action plainly illegal, as was, indeed, that of Commissioner Dudley also.

6. Commissioner Lochren had jurisdiction to re-examine decisions of his predecessors claimed to be absolutely illegal. Such decisions were nullities, and so were the pension certificates granted thereunder. This principle applies to the Tanner certificate. Departmental practice from the earliest times has recognized his right to examine into pensions which are illegal as distinguished from fraudulent.

Of this immemorial practice the court is bound to take

judicial notice when its attention is called thereto by counsel. *United States* v. *Bailey*, 9 Pet. 238. It must be held to settle all questions of doubt. *United States* v. *Hill*, 120 U. S. 169 ; *Robertson* v. *Downing*, 127 U. S. 607 ; *Schell's Executors* v. *Fauche*, 138 U. S. 562 ; Endlich on Interpretation of Statutes, section 360, and cases cited. "Of course the question is at rest and it ought not now to be pursued." *The Laura*, 114 U. S. 111 ; *Stewart* v. *Laird*, 1 Cranch, 249 ; *McPherson* v. *Blacker*, 146 U. S. 1.

This practice of reconsideration has been recognized by Congress and by judicial decision. Act of July 25, 1882, ch. 349 ; sec. 4775 R. S.; act of June 21, 1879 ; act of December 21, 1893 ; *Harrison* v. *United States*, 2 Ct. Cls. 122.

The language of the Supreme Court in *United States* v. *Bank of Metropolis*, 15 Pet. 377, greatly relied on by the court below, has never been followed by the Supreme Court of the United States ; but the course of decisions has been much to the contrary. *The Floyd Acceptances*, 7 Wall. 666 ; *Hunter* v. *United States*, 5 Pet. 173 ; *United States* v. *Jones*, 8 Pet. 375 ; *United States* v. *MacDaniel*, 7 Pet. 1 ; *Whiteside* v. *United States*, 93 U. S. 247 ; *Hawkins* v. *United States*, 96 U. S. 689 ; *McElrath* v. *United States*, 12 Ct. Cls. 201 ; *United States* v. *Johnson*, 124 U. S. 236.

A Commissioner of Pensions has no higher authority in the judicial world than a judge of probate, or a prize court, or a court martial, or a Commissioner of the General Land Office, or a Commissioner in Bankruptcy. The rules applied to him, therefore, are those laid down in the familiar case of *Noble* v. *Union River Logging Railroad*, 147 U. S. 165.

7. There is no express statutory authority for such pension certificates. Like the Commissioner's power of revocation, they are the growth of custom, and seem to have been first recognized by Congress in the act of July 8, 1870, ch. 225, sec. 9. Rev. Stat., sec. 4768. The Commissioner is, and always has been, simply directed to pay such and such

rates of pension to persons disabled in such and such a rank. He, or the Secretary of the Interior, or the Secretary of War before him, or the President, devised business methods, one of which obviously suggested itself was the pension certificate. The moment, however, that a pensioner is found not to come within the terms of the law under which he is being paid, the authority of the Commissioner to pay him his pension *ipso facto* ceases. There is thus no property right transferred at a given moment, but the pensioner's right to payment is a continuous one, arising ever new with each quarter day, and depending always on the facts of his case. That no property right is passed is evidenced by the fact that Congress can take away the pension at any moment. Being a mere bounty, it is classed in this respect with those other bounties discussed by this court recently in *United States ex rel. Miles Planting, &c., Co.,* v. *Carlisle,* 5 App. D. C. 138 ; see also *Frisbie* v. *United States,* 157 U. S. 160, where it is said :

"A pension granted by the Government is a matter of bounty. No pensioner has a vested legal right to his pension. Pensions are the bounty of the Government, which Congress has the right to give, withhold, distribute or recall at its discretion. *Walton* v. *Cotton,* 19 How. 355 ; *United States* v. *Teller,* 107 U. S. 64, 68. No man has a legal right to a pension."

Hence the Commissioner of Pensions does not need to go, nor can he go, into a court of equity with a bill to vacate and set aside a pension certificate. If he did so his bill would be dismissed on the ground that he had an ample remedy at law, or rather without going into court at all ; in other words, that no property right had passed, and that he was himself the tribunal to decide the question.

*Mr. Thos. S. Hopkins* and *Mr. Fred. A. Baker* for the appellee :

1. There are only three statutes that in explicit terms define the disabilities entitling a pensioner to enter the high-

est class.　Secs. 4697 and 4698 R. S., and the act of June 18, 1874.　The provisions of these three statutes are as nearly alike as they could well be without being precisely identical. Each statute provides that there must exist a total and permanent disability, resulting in helplessness.　In the first two the degree of " helplessness " is qualified by the words, " or so *nearly* so as to require regular personal aid," &c. That the third—the act of June 18, 1874—was intended to increase the pensions of *all* those who were drawing $31.25 under section 4698, would seem to be beyond contention.

It seems clear that it was the manifest intent of Congress by the several acts quoted to grant the highest rate of pension to each soldier who should make due proof that his disease or injuries were contracted in the service and in the line of duty, and should establish the following additional facts :　1. That his disabilities are permanent ; and, 2, that he is so disabled or so helpless as to require the regular personal aid and attendance of another person.　" Where the language used [in a statute relating to pensions] may be so construed as to carry out a benign policy within the reasonable intent of Congress, it should be done."　*Walton v. Cotton,* 19 How. 355.

2. The attendance contemplated by the statute must be the " regular personal aid and attendance of another person."　If a claimant requires the personal services of another to dress his wounds regularly twice, or even once a day, that is " regular " attendance, and it brings him within the terms of the statute.

That neither " absolute helplessness," nor the condition requiring " constant " aid and attendance, is essential to admit a claimant to the highest class, has been the ruling of the Department for many years.　*Appeal of J. R. Collett,* Pen. Dig. 251 ; *Appeal of E. O. Beers,* Asst. Secy. Reynolds, Dec. 7, 1893.　See also *Miller's case,* 135 U. S. 201.

The contemporaneous construction of a statute by those charged with its execution, especially when it has long pre-

vailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous. *United States* v. *Johnston*, 124 U. S. 253.

This conclusion is emphasized by the act of July 14, 1892. It will be observed that nowhere in this act is the word *"permanent"* used. To entitle one to the benefits conferred by it, his disability need not be permanent, which shows conclusively that it was intended, as the plain reading of the statute shows, to include only cases where the claimant requires temporary or *"periodical"* aid and attendance, as distinguished from " regular " aid and attendance.

The fact that the appellee is able to discharge the duties of a judge upon the bench has nothing to do with the merits of the case. It has never been contended that because a man could use his brain, he was not entitled to the benefits conferred by the pension laws. The only standard has been that of inability to perform *manual labor*. No other has ever been mentioned in the statutes.

3. The allowance of $50 per month by Commissioner Dudley under the certificate issued to the appellee August 16, 1884, was regular and lawful, as was also the action of Commissioner Tanner of May 6, 1889, and of August 16, 1889.

It is contended in the answer of the respondent that inasmuch as Commissioner Tanner considered this appellee's case May 6, 1889, he was powerless to again consider the case on August 16, 1889. The power of a department officer to review his own decision has, so far as is known, never been questioned before. Certainly there are no decisions in support of such a claim. *United States* v. *Cobb*, 11 Fed. Rep. 76. And even if such were the law, it would not apply to this case, for the reason that there was, on August 18, 1889, a pending claim by this appellee on file in the Pension Office.

4. It is a well known principle of law that the acts of a public officer will, in the absence of proof to the contrary,

be presumed to have been regular and lawful.  *Delassus* v. *United States*, 9 Pet. 134.  It is respectfully submitted that after a claim for pension has been acted upon by the Department in the· exercise of a lawful discretion, and the certificate issued and delivered to the pensioner, the presumption is in favor of the legality and regularity of such action.

. 5. The Commissioner of Pensions has no power without the consent and against the wishes of a claimant to revise, review or reverse the action of his predecessor, except for fraud and for mistakes growing out of errors in calculation. See 2 Opin. Atty. Gen. (Taney), 464; Id. (Wirt), 9. The decision in the ·case of the *United States* v. *Bank of the Metropolis*, 15 Pet. 377, rendered in 1841, approving the principle laid down in the opinions of Attorneys-General Wirt and Taney, has never been disturbed in any important particular.  *Case of Lavalette,* 1 Ct. Cls. 149; *Case of Jackson,* 19 Id. ·504; *State of Illinois* v. *United States,* 20 Id. 342; *Day* v. *United States,* 21 Ct. Cls. 262.  See also *United States* v. *Johnston,* 124 U. S. 254.  The doctrine of *res judicata,* then, as applicable to the jurisdiction of the several departments of government, has been fully recognized by the courts and in the departments for more than half a century.  The various Secretaries of the Interior, themselves, have repeatedly recognized its applicability to adjudicated pension claims.  Digest of Pension Law Decisions, 433, 434.

6. Section 4697 and 4698 and the acts of June 18, 1874, and June 16, 1880, provide certain rates in cases of permanent disability requiring regular aid and attendance.  Where pensions have been granted under the provisions of said sections, it is not within the power of the Secretary of the Interior, or of the Commissioner of Pensions, to .review or modify the action of his predecessor affecting such pensions?

7. Neither the Supreme Court of the United States, nor any other court, has ever had the question fairly before it as to whether or not a pension· is a vested right.  There is

*obiter dicta* to the effect that a pension is a " bounty," a " gratuity," a " spontaneous gift," &c.  In the case of *United States* v. *Teller*, 107 U. S. 64, so often quoted, the only question before the court was as to the power of Congress to enact a law providing that no person should draw two pensions at one time (act July 25, 1882, ch. 349, sec. 5).  No one doubts that power.

The case of *Harrison* v. *United States*, 20 Ct. Cls. 122, is also quoted as upholding the doctrine that a pension is a mere " gratuity."  But this case was one involving *fraud*. There is no question but that a pension may be attacked at any time upon the ground of fraud.

The act of Congress of July 14, 1862, (now sec. 4692 R. S.), was a clear contract with those who enlisted after the passage of the act, that in case of incurrence of wounds or disease in the service, they should receive the pension promised in the act.  The right to it was vested in the soldier and in his widow or children.  The consideration for it was the soldier's services, and oft-times his life.  As to the cases of those who had been maimed or killed between March 4, 1861, and the date of the passage of the act, it can hardly be claimed that Congress intended that their rights should be deemed any the less sacred than the rights of those who enlisted subsequent to the passage of the act. See 2 Opin. Atty. Gen. 1.

8. The Supreme Court of the District of Columbia has jurisdiction to issue the writ of *mandamus* to executive officers of the Government to compel them to perform ministerial duties.  *Marbury* v. *Madison*, 1 Cranch. 137 ; *Kendall* v. *United States*, 12 Pet. 524 ; *United States* v. *Schurz*, 102 U. S. 378.  *Mandamus* is a writ commanding the performance of some act or duty therein specified, in the performance of which the applicant for the writ is interested, *or by the non-performance of which* he is aggrieved.  *Legg* v. *Mayor of Annapolis*, 42 Md. 203.

The appellee's remedy in this case is not by injunction, as claimed by appellant, but by *mandamus*.  *Sherman* v.

*Clark,* 4 Nev. 138.　Under sections 471, 4692, 4764 and 4765 Rev. Stats., it becomes the statutory duty of the Commissioner of Pensions to place upon the pension rolls the names of such persons as come within the classes specified by law, and to see that they are continued on the rolls and that their pensions are regularly paid to them.　If the Commissioner of Pensions has unlawfully reduced the rate of pension of this appellee, he has committed a breach of statutory duty, and it is his duty, under the law, to undo the wrong complained of, by putting the appellee back upon the rolls at his former rate.　Failure to do so justifies the issuance of the writ of *mandamus.*　In the case of *Marbury* v. *Madison,* 1 Cr. 137, the delivery of the commission in question was not specifically required by statute, yet the court granted the writ.　Upon this subject of the appropriateness of the remedy by *mandamus* to restore a deprived right, see *Rex* v. *Barker,* 3 Burr. 1266; *Rex* v. *Blooer,* 2 Burr. 1045.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. If there is one question that ought to be regarded as settled, it is that the courts of the United States will not undertake, through the process of *mandamus,* to control the exercise of discretion by an executive officer of the Government in the performance of the duties entrusted to him.

" To the judiciary department is entrusted generally the interpretation of the laws, the determination of rights and the application of remedies, and with the strong sense of their duties and obligations in this regard it is sometimes difficult for the courts to properly appreciate the fact, that the executive department is charged with perfectly independent duties, not alone by the supreme law, but also by legislation thereunder, which require the ascertainment of facts, involve the interpretation of laws, and in many respects call for the exercise of judgment and discretion by

officers who are not required to be lawyers. And this independence is so complete, that no matter how gross an error may be committed, or however ill advised the action · of an executive officer may be, in the execution of these duties, the courts are nevertheless powerless to interfere where no appeal to them is given. Public and private interests may suffer in instances, and rights may sometimes be denied; but these alone do not authorize the interference of the courts with the duties of executive officers. Greater evils could not exist under our system of government than would follow the usurpation by the judiciary of powers not entrusted to them." *Seymour* v. *South Carolina*, 2 App. D. C. 240, 245.

In a case involving the construction of one of the pension acts, which is under consideration here, the Supreme Court of the United States said : " The court will not interfere by *mandamus* with the executive officers of the Government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having no appellate power for that purpose." *United States, ex. rel. Dunlap* v. *Black*, 128 U. S. 40, 48.

The act of the Commissioner of Pensions in this case, if he had the power to act at all (a point that will be considered later), necessarily involved the exercise of judgment and discretion ; it depended upon an interpretation of the pension laws and the application thereof to the facts of re lator's case.

It cannot be said that this was a matter of ready determination and free of all doubt. The two justices of the Supreme Court of the District, before whom the question has been raised, have differed with each other in opinions expressed thereon. One, Mr. Justice Cox, agrees with the Commissioner, while the other, Mr. Justice BRADLEY, has taken the opposite view. We have not considered the question as one for our determination and shall express no opinion on it. Nor are we to be understood, from the conclusion arrived at in this case, as intimating any opinion

with respect to relator's claim to the rating from which he has been reduced by the action complained of in his petition. As was said in the case of *Dunlap* v. *Black, supra:* " Whether if the law were properly before us for consideration we should be of the same opinion, or of a different opinion, is of no consequence in the decision of this case. We have no appellate power over the Commissioner, and no right to review his decision. That decision and his action taken thereon were made and done in the exercise of his official functions. They were by no means merely ministerial acts."

Whether the power shall be exercised by the courts of this District, or by a special tribunal created for the purpose, to review the action of the Commissioner of Pensions in awarding or denying, in increasing or decreasing pensions, is a matter within the exclusive jurisdiction of Congress. Though necessarily aware of the long-established rule of non-interference by the courts in such matters, Congress has not seen fit to adopt a new rule in the premises, or to give a remedy in the courts to an aggrieved party. On the contrary, a qualified jurisdiction which seems to have once existed in the Court of Claims, over pension claims, was expressly taken away by a provision in the act of March 3, 1877, ch. 359, sec. 1.

2. Before proceeding further, we deem it proper to advert to a question of procedure, apparent on the record, lest we might be understood as giving our unqualified sanction to the course that has been pursued. Relator did not seek to exercise his undoubted right of appeal to the Secretary of the Interior from the ruling of the Commissioner. This he should have done. Even where the right to the writ is otherwise clear, still, it will not issue where there is another plain, legal remedy. The reasons for not having exercised this right of appeal are insufficient. But the Secretary, in his answer, expressly waives this condition and defends on other grounds. If the exercise of the right of appeal to him was necessary to the jurisdiction of the

court, it is clear that his waiver could not cure the defect. If not jurisdictional, in that sense, but rather a question of privilege on his part, then he could waive it.

The decision of this question is not necessary in our view of the whole case, and as it has not been argued we will pass it by, remarking only that it is one of doubt, and that we are not to be understood as acquiescing in the Secretary's right to waive the point and compel action by the court, in consequence.

3. It is earnestly contended, on behalf of the relator, that his pension rate having been adjudicated by Commissioner Tanner, became a fixed and vested legal right beyond the power of a succeeding Commissioner to disturb except for actual misrepresentation and fraud. If this contention be well founded the judgment must stand. *United States* v. *Schurz,* 102 U. S. 378 ; *Noble* v. *Union River Logging Co.,* 147 U. S. 165.

On the other hand, the respondent contends that it is both the right and the duty of the Commissioner of Pensions to correct the rating of the pensioner whenever informed and satisfied of its illegality, without regard to its original procurement by actual fraud. He further claims an estoppel, on the part of relator, to deny this authority, because the rating which he seeks to maintain depends upon a ruling of Commissioner Tanner, setting aside, for error of law, the previous ruling in his case made by Commissioner Dudley. To this it is replied that a new ruling may be made at any time in favor of a pensioner, but never against him, and for that purpose his case may always be considered as open. We find no reasonable support for this one-sided view. Surely, if the right exists to set aside a former decision, made upon the same facts, because it was founded in mistake of law and thereby deprived the applicant of a just claim under a correct interpretation of the statute, the same right ought to exist, in favor of the Government, to reduce a payment, the full amount of which is without legal foundation. In this view, then, if a decision

of the Commissioner were to be regarded as *res judicata,* that made by Commissioner Tanner, raising relator's rate, was without authority and void, and the present Commissioner would be justified, for that reason alone, in returning him to the rate fixed by the decision of Commissioner Dudley.

To what extent the decision of one Secretary, or head of department, shall be considered as binding upon his successors, has never been regulated by statute nor fully settled by judicial decision.

In matters relating to grants of land it is settled that where the decision has been made and all the requisites of the law complied with, the title becomes vested, in so far as the executive power is concerned, and cannot be recalled. It can only be avoided thereafter by proceeding in a court for fraud or illegality. *United States* v. *Schurz,* 102 U. S. 378, 402 ; *Noble* v. *Union River Logging Co.,* 147 U. S. 165, 175.

So, where the right of a third person has attached under a decision made, a settlement had, or an account stated, it cannot be divested, or impaired, by the subsequent action of a successor in office. *United States* v. *Bank of Metropolis,* 15 Pet. 377. Notwithstanding some remarks made in the opinion in that case, considered apart from its facts, would sustain the view that the action of Postmaster General Barry, in making certain allowances to a contractor, could not be reviewed by his successor, it is nevertheless reasonably plain that they had relation to the fact that the allowances had been made and the right of the bank had accrued, through indorsement to it in due course of business, of a draft accepted by the Postmaster General upon the foundation of that settlement. Concluding its remarks, the court said : " It is no longer a case between the correctness of one officer's judgment and that of his successor. A third party is interested and he cannot be deprived of a payment on a credit so given, but by the intervention of a court to pass upon his right."

In another case, where a sum of money had been paid to a naval officer by the Secretary of the Navy to cover certain expenses allowed by him, the power of the accounting officers of the Treasury, to overrule the Secretary, declare his payment without authority, and deduct the sum so paid from the pay due the officer, was denied. *United States* v. *Jones*, 18 How. 92, 95. That case is readily distinguishable from this. In *United States* v. *Johnston*, 124 U. S. 236, 253, 255, which was a suit to recover certain moneys paid upon the allowance by the Secretary of the Treasury of an agent's expense account, after the lapse of many years from the date of settlement, the court held that the account could not be attacked for irregularity or mistakes because of insufficient evidence, especially after such great lapse of time. It was said, however, that the approval of the account by the Secretary " would not be conclusive, if it appeared either that such approval was procured by fraud, or that such expenses were incurred in violation of some positive statute, or in contravention of public policy."

Subject to the foregoing limitations, it can be said that no case has denied the doctrine enounced in *United States* v. *MacDaniel*, 7 Pet. 1, as follows : " It will not be contended that one Secretary has not the same power as another to give a construction to an act which relates to the business of his office."

In this case the ruling does not affect, or attempt to affect the right of relator to retain the large sums of money which he has received under the decision of Commissioner Tanner. That might present a very different question. The right of no third person has intervened ; nor could it, because the pension is not transferable and not subject to claims of creditors.

The pension certificate itself is the creature of department practice and has no function analogous to a patent or a grant. The claim to the pension is not a vested, legal right. It is a bounty that may be given or recalled, increased or diminished at the pleasure of Congress. *Walton*

v. *Cotton,* 19 How. 355 ; *United States* v. *Teller,* 107 U. S. 64, 68 ; *Frisbie* v. *United States,* 157 U. S. 160, 166.

The practice of reconsideration for error or illegality seems to have prevailed in the Pension Office from a very early period. A proceeding in the case of Captain Somerville, as early as 1803, and certain decisions made under later pension laws, cited in the brief of respondent, sustain this view. Dig. pp. 398, 399, 435. SCOFIELD, J., in *Harrison* v. *United States,* 20 Ct. Claims Rep. 122, 126, states the rule and the reasons for its existence very strongly as follows : " The power of revision may well be considered to be inherent in the nature of the first decision as well as in the necessities of the bureau. The pension is a gratuity. It involves no claim of right, no agreements of parties and, as it is not assignable, no acquired rights of third parties. The law describes a class of persons upon whom it chooses to bestow its bounty. The Secretary and Commissioner are directed to find out and make a list of persons thus described. The proceedings and evidence are largely *ex parte.* From the vast number of applicants, the work must be performed and the roll made up, for the most part by the clerks. If placing the name of an applicant upon the roll is to be considered a judicial act, should it not be considered only a judgment *nisi ?* "

The court will take notice of a long continued usage or practice in the executive departments. *United States* v. *Bailey,* 9 Pet. 238, 255. And such practice and the interpretation given to statutes, and the powers exercised thereunder are entitled to very great weight. *The Laura,* 114 U. S. 411, 416 ; *United States* v. *Hill,* 120 U. S. 169, 182.

Certain provisions of the pension acts, antedating the first action in relator's case, seem to recognize the existence of the practice, and this recognition is especially plain in the act of June 21, 1879, which repeals certain sections of the Revised Statutes and concludes with this proviso : " Provided, that the Commissioner of Pensions shall have the same power as heretofore to order special examinations,

whenever in his judgment the same may be necessary, *and to increase or reduce the pension according to right and justice.*"

There are, as we have seen, very strong reasons for holding that where a title has passed, or the rights of innocent third persons have supervened, or there has been a very great lapse of time, without question, the decisions of the head of an executive department should be considered as beyond the power of his successors to disturb.

The reasons are quite strong also, why, as to transactions wholly ended, where credit has been given or money paid over, there should be no recognized right of review save for fraud or manifest illegality. But where the matter is one that involves future recurring payments of money there seems no good reason why succeeding incumbents of the office, charged with a present responsibility, should be concluded by the decisions of their predecessors. They should not lightly overrule their predecessors; but when satisfied and convinced that error has been committed and that there is no legal warrant for the payment demanded, it would seem to be their duty, as well as their right, to rectify the error. The recognition of the power in such cases involves no destruction of vested rights, no impairment of the obligations of contracts, and no abridgment of the equities of third persons. It is a question simply of the proper performance of a present duty, the conscientious discharge of a present obligation. This seems to be the rule that has prevailed in the Treasury Department in analogous cases. It is entirely within the regulating power of Congress, if found unsatisfactory. We have heretofore referred to certain provisions of the statutes as recognizing the existence of the power exercised by the respondent in this case. But since this controversy arose, though prior to the particular act complained of in this case, a statute has been enacted which distinctly legalizes the practice pursued by respondent. Presumably to meet complaints prevalent concerning the action of the Pension Office in

suspending and reducing pensions the following provision was inserted in the appropriation act of December 21, 1893 : " Provided that any pension heretofore or that may hereafter be granted to any applicant therefor under any law of the United States authorizing the granting and payment of pensions, on application made and adjudicated upon, shall be deemed and held by all officers of the United States to be a vested right in the grantee to that extent that payment thereof shall not be withheld or suspended until, after due notice to the grantee of not less than thirty days, the Commissioner of Pensions, after hearing all the evidence, shall decide to annul, vacate, modify, or set aside the decision upon which such pension was granted. Such notice to grantee must contain a full and true statement of any charges or allegations upon which such decision granting such pension shall be sought to be in any manner disturbed or modified."

In this statute, for the first time, the pension is recognized as a vested right and then to an extent only that prevents its summary suspension or abrogation ; at the same time the right " to annul, vacate, modify, or set aside the decision " upon which a pension has been granted is distinctly and fully recognized.

Holding, as we must do, that the respondent, as Commissioner of Pensions, had the power to review and modify the decision of the former Commissioner in relator's case and reduce his rating, and that the exercise of this power was a matter of judgment and discretion in the discharge of his official duties, over which the courts have no control, it follows that *the judgment appealed from must be reversed, with costs to the appellee, and relator's petition dismissed. And it is so ordered.*