## UNITED STATES *v.* JOHNSTON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued December 15, 16, 1887. — Decided January 9, 1888.

The entire administration of the system devised by Congress for the collection of captured and abandoned property during the war was committed by the acts regulating it to the Secretary of the Treasury, subject to the President's approval of the rules and regulations relating thereto prescribed by him, and with no other restriction than that the expenses charged upon the proceeds of sales be proper and necessary and be approved by him; and his approval of an account of expenses incurred on account of any particular lot of such property made before the passage of the joint resolution of March 31, 1868, 15 Stat. 251, is conclusive evidence that they were proper and necessary, unless it appears that

their allowance was procured by fraud, or that they were incurred in violation of an act of Congress or of public policy.

The joint resolution of Congress of March 31, 1868, 15 Stat. 251, affords evidence that the practice of the Secretary of the Treasury prior to that date not to cover into the Treasury the sums received from the sale of captured and abandoned property, but, to retain them in the hands of the Treasurer in order to pay them out from time to time on the order of the Secretary, was known to Congress, and was acquiesced in by it, as to what had been previously done; and all this brings the practice within the well settled rule that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous.

Settled accounts in the Treasury Department, where the United States have acted on the settlement, and paid the balance therein found due, cannot be opened or set aside years afterwards merely because some of the prescribed steps in the accounting, which it was the duty of a head of a department to see had been taken, had been in fact omitted; or on account of technical irregularities, when the remedy of the party against the United States is barred by the statute of limitation, and the remedies of the United States are intact, owing to its not being subject to an act of limitation.

THE following was the case as stated by the court.

This writ of error brings up for review a judgment for the defendant in error in an action brought against him on the 29th day of April, 1879, for the value of certain cotton which came to his hands, as an assistant special agent of the Treasury Department, in the year 1865, and which, it is alleged, he has not accounted for to the plaintiff, but converted to his own use. The defendant became such agent on the 8th of May, 1865, under a written appointment by the Secretary of the Treasury. He was charged with the duty of receiving and collecting such cotton in the counties of Lowndes, Monroe, Oktibbeha, and Noxubee, in the State of Mississippi, as had been purchased by or was held on account of the so-called Confederate States Government, and of forwarding the same to agents of the department at Memphis or Mobile, as, in his judgment, was best for the government.

His commission was accompanied by a letter of instructions, requiring him, with as little delay as possible, to ship the

cotton received or collected to Wm. W. Orme, supervising special agent at Mobile, " sending forward with each lot an account of expenses (which will be paid by them), together with a full record of the cotton shipped, &c., as required by the fourth regulation concerning captured, abandoned, and confiscable personal property." He was informed that his compensation would be thereafter fixed, and would depend, in great measure, upon the result of his efforts ; but that it should be reasonable and liberal for the services performed.

The defendant, in his answer, denied that he had omitted to account for any cotton received or collected by him, as such agent. For further defence, he alleged that after the times mentioned in the complaint, and on or about March 15, 1866, a just, true, and full accounting of his acts, as such agent, was had with the United States, upon which he surrendered all papers, documents, and vouchers in his hands relating to his agency ; that upon such accounting the sum of $33,972.59 was awarded to him, of which $2186.69 represented his per diem allowance, and the balance his commissions ; that said per diem allowance was paid on the 15th of May, 1866, and said commissions on the 15th of January, 1868 ; and that he was thereupon fully released, acquitted, and discharged from liability of every kind to the government.

By agreement of the parties, the issues were heard and determined, in the first instance, by Hon. William G. Choate, as referee, who made a report of his special findings of fact and law, accompanied by an elaborate opinion, in support of the conclusion that the defendant was entitled to a judgment dismissing the complaint on the merits. The case was subsequently tried by the court — the parties, by written stipulation filed, having waived a jury. The court adopted the special findings of fact made by the referee, as its own findings, and dismissed the complaint.

The several lots of cotton in question were delivered to one Stewart, of Mobile, in the latter part of the year 1865. The circumstances under which they were delivered were — according to the findings of fact — as follows : The cotton in the counties constituting defendant's district was stored at various

points more or less remote from the Mobile and Ohio Railroad; much of it in very bad condition, requiring rebaling, or new covering and ropes. In consequence of many impediments, arising from the unsettled state of the country, to the successful execution by the defendant of his duties by agents of his own selection, he obtained special authority from the Secretary of the Treasury to make contracts with responsible persons, for collecting cotton, putting it in shipping order, and delivering it at the railroad; the contractors to be paid *in kind* at the time of delivery, or in money after the cotton had been sold, and the proceeds realized by the Government. The first lots of cotton were shipped to Dexter, the supervising agent at Mobile. Afterwards, the defendant was directed by the Secretary to ship, and he did ship, the cotton directly, through his own agents at Mobile, to Simeon Draper, at New York, who had been appointed as the general agent of the Treasury Department to sell all the cotton collected in the South. Defendant's first agents at Mobile were Weaver & Stark; but, on August 14, 1865, he appointed one Cuny. The Government did not furnish money to pay the expenses attending the collection, transportation and shipping. But Cuny undertook with the defendant to settle all bills for railroad freights, the weighing and pressing of the cotton, and other incidental expenses connected therewith up to the time of shipment to New York; and he also agreed with the defendant to furnish the means necessary to cover such expenses. He arranged with Stewart at Mobile to provide means for these purposes, the latter to be reimbursed from time to time by Government cotton at the market value. Stewart accordingly made large advances to Cuny between September 4, 1865, and January 26, 1866. These advances included $9307. 21 of expenses, which Dexter, supervising special agent for the Treasury Department for the district in which Mobile was situated, incurred on cotton from Johnston's district, and which expenses, Dexter insisted, should be paid by the defendant. The latter at first declined to pay that bill, but subsequently, upon the advice of Mellen, a general agent of the Treasury Department, he sold cotton to meet it. Under the arrangement between

Cuny and Stewart, the latter received between October 17, 1865, and December 16, 1865, different lots of cotton aggregating 483 bales, which is the cotton now in question, and gave credit therefor, at its market value, in his account with Cuny for advances. The total value of this cotton was $82,-300.24. Stewart paid the internal revenue tax of two cents per pound — $3486.64 — on all except the last one hundred bales, leaving $79,813.60 as the net value of the cotton. The first of these transfers to Stewart was without the knowledge of the defendant, but he subsequently approved or acquiesced in what Cuny did. This disposition of the 483 bales was without authority from the plaintiff, except as to the part used in meeting Dexter's bill.

The following additional facts were found by the court below:

"August 18, 1865, the Secretary of the Treasury issued a general letter of instructions directing all cotton to be forwarded to Simeon Draper, at New York, for sale, and that all money required by supervising agents to defray expenses should be sent upon their estimates therefor made to the Secretary on the 1st of each month. In September, 1865, Mr. Johnston had made an arrangement to draw against Simeon Draper, at New York, for the expenses on the cotton incurred at Mobile, including the cost of transportation to Mobile, and such drafts were drawn accordingly to the amount of upwards of $150,000 between the 29th of November, 1865, and the 31st of January, 1866. The drafts included one dollar a bale commission, which defendant paid to Cuny on the cotton shipped by him after the drafts were paid. To carry out his instructions, that these drafts should be accompanied by vouchers, showing the details of the expenses drawn for, the receipted bills of the railroad company paid by Cuny through the advances made by Stewart, and other bills so paid were surrendered, and duplicate receipts were taken to conform to the shipments to Draper against which drafts were drawn, and these duplicate vouchers accompanied the drafts. The same expenses which had thus been paid out of the cotton transferred to Stewart, to the amount of about $68,000, were in-

cluded in the drafts upon Draper, and by him paid to Johnston, so that as to these 483 bales the defendant had been a second time paid by the Government to that extent, the expenses for the payment of which they had been transferred to Stewart.

"On the 11th of January, 1866, the Secretary of the Treasury, by letter, called upon the defendant to make up and forward a full statement of his transactions, and some time in the month of February, 1866, the defendant and his chief clerk, Dr. Vaughan, went to Washington with their books and papers, and an account current or summary statement which had been made up at Columbus, purporting to show the whole amount of cotton collected by the defendant and the disposition thereof. They were referred, by the subordinate in the Secretary's office in charge of the captured and abandoned property division, to the Commissioner of Customs, who, at that time, under direction of the Secretary, had charge of the examination and passing of similar accounts. Meanwhile, however, certain charges against the defendant had been received in the Treasury Department from the War Department, and the Secretary directed that these charges should be answered before the defendant's account was passed upon, and a special reference of these charges was made by the Secretary for examination to a clerk in his office named Parker, since deceased. These charges were satisfactorily answered, and the examination of his accounts by the Commissioner of Customs followed. Some objections were made to the form of the account of cotton collected, and a new account was made up upon blanks furnished by the office of that part of the transactions. In the account current or summary statement made up at Columbus, the 483 bales of cotton in question were stated as follows:

"'Sold by R. H. Cuny, to pay bills of Dexter and others; 483.'

"At the suggestion of the examining officer in the Commissioner's office, a new summary statement was made up by Dr. Vaughan, dividing this item into two, namely:

" ' Sold by consent of General Agent Mellen, by R. H. Cuny, to pay Dexter's bill of expenses . . . . . 55

" ' Sold and proceeds paid to officers and garrisons to secure protection to cotton in their charge, and to repel thieves . . . . . . . . . . . . . . . . 428'

" The only vouchers now remaining on file in the Treasury Department in support of this last item are two affidavits, one by the defendant and the other by Dr. Vaughan, the defendant's clerk and chief assistant, sworn to at Washington, during the pendency of this examination, showing payments to military officers for extra vigilance in guarding the cotton, protecting it against thieves and raids; copies of which are hereto annexed, marked schedules C and D. The number of bales assigned to the item of Dexter's bill does not conform to any particular lot of cotton, part of the 483 bales transferred to Stewart, but is substantially correct as representing upon an average of the net proceeds of the cotton the amount of Dexter's bill.

" There was exhibited to the officers appointed by the Secretary to examine his accounts some proofs of large expenditures of money which, together with the payments to military officers, they held to be sufficient to justify them in passing this item. These expenses, aside from the payments to military officers, aggregated about $68,000, and the military payments about $29,000. These expenses, other than the military payments, were properly and necessarily incurred by the defendant in the discharge of his duty as assistant special agent in the care and protection of the cotton after its delivery by the contractors, and all these payments, including the military payments, were made necessary by the unsettled state of the country, the great accumulation of the cotton which the railroad company was unable to transport, the danger of theft and robbery, and the interference of other agents or persons claiming to be agents of the Treasury Department, and of military officers. The military payments included $10,000 paid out for Colonel Young, which, however, was not proved to have been received by him, and which the defendant collected from the

contractors. These military payments were all made in the *bona fide* belief that they were necessary to protect the interest of the United States in the cotton, to secure increased vigilance, or to prevent connivance with parties interfering with or attempting to interfere with the cotton.

" The result of the examination of the account in the office of the Commissioner of Customs was that the Commissioner wrote to the defendant a letter dated the 15th March, 1866, as follows: ' Your property accounts as assistant special agent of the Treasury at Columbus, Mississippi, from May 8, 1865, to March 15th, 1866, have this day been examined in this office and passed, there being no difference.'

" Upon the receipt of this letter the defendant wrote to the Secretary, communicating to him the contents of the letter received from the Commissioner of Customs, and stating that he had presented to Mr. Parker a written answer to the military charges, and that Mr. Parker expressed himself entirely satisfied, and that he would so report to the Secretary; and requested an instruction to Mr. Draper, at New York, to pay him his commissions allowed under the regulations on the sales of such cotton as Mr. Draper had received of his collecting, when the Secretary should receive a report from Mr. Parker.

" To this the Secretary replied under the same date, March 15, 1866, as follows : ' I have received your letter of this date, advising me that the Commissioner of Customs had favorably reported on your property account, and that your explanation of charges made by certain military officers against you has shown them to be without substantial foundation, and asking me to instruct the cotton agent at New York to pay you the commissions allowed by the regulations of August the 18th last, on the sales of such property of your collection as he has received. It affords me great pleasure to receive so gratifying a statement in regard to your affairs, and I have accordingly this day instructed the Commissioner of Customs to issue a requisition for your per diem compensation, at the rate of $6 per day, from the date of your appointment, and for such mileage as you may be entitled to at the rate of ten cents per mile. At present no payments on account of commissions or

percentage are made to any of the agents of the Department, and I deem it inexpedient to make an exception to this rule in any case till sufficient time has elapsed to enable me to examine and understand the whole matter connected with the collection and forwarding of Government cotton. Just now my time is too much occupied with other matters of vital importance, to afford me an opportunity to give your case that consideration which justice to yourself, no less than to the Department, requires.'

"On the same day, the Secretary by letter instructed the Commissioner of Customs as follows: 'The compensation of Harrison Johnston, assistant special agent to this Department, whose appointment is dated May 8, 1865, has been fixed at $6 per day, with an allowance to cover travelling expenses of 10 cents per mile for all distances actually travelled by him, and commissions on the cotton collected by him at the same rate as is allowed to other assistant agents, in accordance with general letter of instructions dated August 18, 1865. You are accordingly hereby authorized to issue a requisition in the usual form for his per diem allowance at that rate to date and for such mileage as he may be entitled to. For the present no payments on commissions or percentage account are made to any agents.'

"On the 16th March, 1866, the defendant was directed by the Secretary to answer certain charges made in letters received by the Department from General Agent Mellen, to which the defendant replied in a letter to the Secretary on the same day containing the following passage: 'I had the honor on yesterday to request you to instruct Mr. Draper to pay me my commissions, basing that request on the assurance that my answers to all charges were satisfactory and my property account correct, not knowing then of these letters from Mr. Mellen. I now beg leave to withdraw the request until you are fully satisfied of my every official act.'

"No further direct action was taken by the Secretary with reference to these charges of General Agent Mellen, or the defendant's reply thereto.

"On the 6th September, 1866, the defendant wrote to the

Secretary of the Treasury : ' If there are no longer any reasons for withholding the commissions due me from the sale of cotton collected by me and forwarded to Mr. Draper, I will thank you for an order upon Mr. Draper to pay over to me commissions due me under regulations of August 18, 1865.' To which the Secretary replied on the 17th September, 1866: ' The numerous undecided claims upon the cotton collected by you make it inexpedient to award you at present the promised commissions on the net proceeds of sale of the amount of your collections.'

" On the 8th January, 1867, the Secretary wrote the Commissioner of Customs as follows : ' Hereafter in the adjustment of accounts of agents of the Department who have been engaged in the collection of captured and abandoned property, you will make no requisition in favor of any of them for any balance that may be found due until the details of such account have been referred to me, and you have received further instructions relative thereto.'

" On the 9th March, 1867, the Secretary wrote to the Commissioner of Customs as follows: ' As the various supervising and assistant special agents lately in office are claiming the amounts to which they deem themselves entitled as commissions on the proceeds of property collected by them under my general letter of instructions of August 18, 1865, you will please report to me the names of those whose property accounts, as well as money accounts, have been satisfactorily adjusted.' To which the Commissioner replied, on the 12th March, as follows : ' In reply to your inquiry of the 9th inst., received this A.M., asking for the names of those agents whose property accounts have been examined and adjusted, I have to report that up to the present only money accounts have been adjusted.'

" On the 13th March, 1867, the Secretary wrote to the Commissioner of Customs as follows: ' Referring to your reply of yesterday to my inquiry of the 9th inst., relative to the property accounts of supervising and assistant special agents, I now request that you will transmit them to the First Auditor for immediate examination and adjustment.'

" On the 4th June, 1867, the defendant wrote the Secretary as follows : ' I desire to be informed whether all claims for proceeds of cotton from my district have been adjusted, and whether there is any further objection to the payment of my commissions as assistant special agent of the Treasury Department.' To which, on the 12th June, 1867, the Assistant Secretary of the Treasury replied : ' The Secretary directs me to say that nothing can be done in the matter until the accounts of the New York agency and the various property accounts of the supervising special agents are collected and settled, which he has ordered to be done as speedily as practicable.'

" On the 15th of January, 1868, the Secretary wrote to the Commissioner of Customs as follows: ' You are hereby authorized and instructed to issue a requisition on F. E. Spinner, Treasurer, and U. S. special agent, in favor of Harrison Johnston, late assistant special agent, for the sum of $26,785.90, being the balance in full found due to him for commissions on the net proceeds of cotton collected by him and sold in New York on government account in accordance with my letter of August 18, 1865. The total amount earned by him under that letter is $31,785.90, on which he has had previously an advance of $5000. The present requisition is for the balance. This requisition followed an adjustment of the balance at that sum communicated to the Secretary by the Commissioner of Customs in a letter dated January 15, 1868, and requesting a remittance to cover the same, and this amount was thereupon paid to Mr. Johnston.'

" On the 16th of August, 1868, the First Auditor addressed to the Commissioner of Customs a letter containing a detailed statement of the defendant's property account, stating that he had examined and adjusted the same, charging him with 30,610 bales collected and crediting him with the cotton shipped to Draper, paid to contractors in kind, and various other items of credit as in the previous account rendered by the defendant and passed by the Commissioner of Customs, and included the following credits :

" ' By cotton sold to pay expenses . . . . . 55 bales.
     "      "      " and proceeds paid military offi-
                      cers for protecting cotton from
                    , being burned and stolen by
                      raiders . . . . . . . . . 428 bales.'

" At the foot of this account so stated the Commissioner added :

" ' Admitted and certified.            N. SARGENT,
                              Commissioner of Customs.'

" On the 27th of February, 1869, the Commissioner of Cus-. toms wrote the defendant as follows: 'Your account as assistant special agent of the Treasury Department at Columbus, Mississippi, on account of captured and abandoned property, for cotton received and disposed of has been adjusted and closed on the books of the Department.' "

*Mr. Assistant Attorney General Maury* for plaintiff in error.

*Mr. Benjamin H. Bristow* for defendant in error. *Mr. David Willcox* was with him on the brief.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

By the act of March 13, 1863, 12 Stat. 820, c. 120, providing for the collection of abandoned property, it was made lawful for the Secretary of the Treasury, as from time to time he should see fit, to appoint a special agent or agents to receive and collect all abandoned or captured property — other than property used or intended to be used for carrying on war against the United States — in any portion of any State or Territory designated as in insurrection against the lawful government of the United States, by the President's proclamation of July 1, 1862. The second section provided that " any part of the goods or property received or collected by such agent or agents may be appropriated to public use on due appraisement and certificate thereof, or forwarded to any place of sale

within the loyal states as the public interests may require; and all sales of such property shall be at auction to the highest bidder, and the proceeds thereof shall be paid into the treasury of the United States." The third section directed the Secretary to cause a book or books of account to be kept, showing from whom such property was received, the cost of transportation, and the proceeds of the sale thereof. The owner was given the right, within a prescribed period, to prefer his claims to the proceeds in the Court of Claims, and on proof of his right to the same, and that he had not given any aid or comfort to the rebellion, "to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof."

But the act of July 2, 1864, 13 Stat. 375, c. 225, greatly enlarged the powers of the Secretary of the Treasury in reference to captured and abandoned property. The first section authorized sales of such property, under the act of 1863 to be made "at such places, in states declared in insurrection, as may be designated by the Secretary of the Treasury, as well as at other places," authorized by the original act. In addition to the property to be received, collected, and disposed of as provided in the act of 1863, the agents, approved by the Secretary, were required to take charge of and lease the abandoned lands, houses, and tenements within the districts therein named, and provide, in such leases or otherwise, for the employment and general welfare of all persons, within the lines of national military occupation in the insurrectionary States, formerly held as slaves, who are or shall become free. Sec. 2. It was also provided that all moneys arising from the leasing of abandoned lands, houses, and tenements or from sales of captured and abandoned property, collected and sold in pursuance of the act of 1863, or of the act of 1864, "shall, after satisfying therefrom all proper and necessary expenses to be approved by the Secretary of the Treasury, be paid into the treasury of the United States; and all accounts of moneys received or expended in connection therewith shall be audited

by the proper accounting officers of the treasury." Sec. 3. By the eleventh section of the same act it is provided that "the Secretary of the Treasury, with the approval of the President, shall make such rules and regulations as are necessary to secure the proper and economical execution of the provisions of this act, and shall defray all expenses of such execution from the proceeds of fees imposed by said rules and regulations, of sales of captured and abandoned property, and of sales hereinbefore authorized."

It is quite clear that while the approval of the President was made essential to the validity of all rules and regulations in relation to captured and abandoned property, the entire administration of the system devised by Congress for the collection of such property, within the insurrectionary districts, and its sale thereafter, was committed to the Secretary of the Treasury. Upon him alone was imposed the responsibility, in the first instance, of making rules and regulations for the "proper and economical execution" of the statutes in question, through agents whom he should designate. Congress was aware of the unsettled condition of that part of the country dominated by the military power of the insurrectionary government, and recognized the necessity of investing some one officer with full authority to decide what expenses were fairly chargeable against the proceeds of captured and abandoned property. Such authority was conferred upon the Secretary of the Treasury, subject to no other restriction than that the expenses charged upon the proceeds of sales be "proper and necessary," and be approved by him. But no rule was prescribed for his guidance in determining what expenses were to be regarded as of that character; for the reason, perhaps, that as each collection and sale of captured and abandoned property must depend upon its special circumstances, it was not practicable to establish a rule that would control every case. As no expenses could be charged against the proceeds of any sale except upon the approval of the Secretary of the Treasury, and as his discretion must have been exercised with reference to the special facts of each case, his approval of an account of expenses in relation to the collection

and sale of any particular lot of captured and abandoned prop-
erty should be deemed conclusive evidence that such expenses
were proper and necessary, unless it appeared that the allow-
ance of such expenses was procured by fraud, or that the ex-
penses were incurred in violation of some positive statute, or
of public policy. It is impossible to suppose that Congress
intended that every such account — after being approved by
the Secretary— should be subject to review by some subordi-
nate officer of the Treasury, or even by the courts, and to be
disallowed, merely because in the judgment of that officer, or
of the courts, such expenses should not have been incurred.

It is, however, contended that the words in the third sec-
tion of the act of 1864, " all accounts of moneys received or
expended in connection therewith shall be audited by the
proper accounting officers of the Treasury," negative the sup-
position that those officers cannot disallow expenses incurred
in the collection and sale of captured and abandoned property,
which the Secretary may have approved as proper and neces-
sary. By " proper accounting officers of the Treasury " in
that statute, it is contended, is meant the First Auditor and
the First Comptroller. It is consequently argued that the
settlement upon which the defendant relies constitutes no ob-
stacle to the examination of the items of his accounts.

The act of March 3, 1817, c. 35, § 2, 3 Stat. 366, pro-
vides that " all claims and demands whatever by the United
States, or against them, and all accounts whatever in which
the United States are concerned, either as debtors or creditors,
shall be settled and adjusted in the Treasury Department."
By the same act, it was made one of the duties of the First
Comptroller to examine all accounts settled by the First
Auditor, and certify the balances arising thereon to the Regis-
ter. And among the duties of the First Auditor is that of
receiving and examining all accounts accruing in the Treasury
Department, certifying the balance due on such accounts, and
transmitting the same, with the vouchers and certificates, to
the First Comptroller for his decision thereon. These pro-
visions have been preserved, and constitute §§ 236, 269,
and 277 of the Revised Statutes. It is contended in behalf

of the defendant, that the accounts which the third section of the act of 1864 required to be "audited by the proper accounting officers of the Treasury" were strictly money accounts, as distinguished from property accounts; whereas the accounts of the defendant, in respect of the 483 bales of cotton in question belong, it is insisted, to the latter class. The referee in his opinion says:

"What took place in this case was this: The defendant having finished the work of his agency, was called upon by the Secretary of the Treasury to settle his property accounts. The defendant presented himself at the Treasury Department, appeared before the officers designated by the Secretary for the purpose of adjusting accounts of that character, and put in a claim to be credited with the 483 bales in question. As to this he claimed that he had expended on behalf of the Government, and as necessary disbursements in the execution of the duties of his agency, a sum considerably exceeding the value of the 483 bales for which he acknowledged himself liable to account. It would have been competent and proper for the Secretary, or the accounting officer, to have treated this claim for disbursements as a money account, which would then, according to the routine of the office at that time, have gone to the First Auditor for examination. That this was not done is, however, at most an irregularity. The Secretary had authority and jurisdiction, however, to settle and adjust the defendant's property account, and this he did, making this offset or allowance. He thereby necessarily passed and approved the expenses in question, both as to their nature as necessary and proper and as to their amount; and by the statute this question was confided to his exclusive determination. Upon the basis of this adjustment of the property account the defendant's account for commissions was duly adjusted and paid by order of the Secretary. In fact, the Department twice thus acted on the basis of the adjustment of the defendant's property account."

While there is much force in this view of the case, we do not deem it necessary to decide whether the accounts of defendant, in respect to the 483 bales of cotton, were required

by the statute of 1864 to be audited by the First Auditor and transmitted to the First Comptroller for his decision thereon. If the act of 1864 should be held to have required this, it would not follow that those officers could have disregarded the action of the Secretary of the Treasury in allowing the expenses in question. In auditing those accounts, they would have been bound to regard such action of the Secretary as final. What was said in *United States* v. *Jones*, 18 How. 92, 96, may be repeated here, as applicable to accounts which have been finally acted upon by a head of department, invested with authority in the premises. There the question was as to the right of accounting officers to review the action of the Secretary of the Navy in approving certain disbursements made by an officer of the Navy in conformity with the orders of the Secretary. This court said: ".The accounting officers of the Treasury have not the burden of responsibility cast upon them of revising the judgments, correcting the supposed mistakes, or annulling the orders of heads of departments." See *McKnight* v. *United States*, 13 C. Cl. 292, 298, 309.

But, waiving any decision as to the power of accounting officers, under the act of 1864, it is sufficient for this case to say that the Secretary of the Treasury proceeded upon the ground that the defendant's accounts in reference to this cotton were property accounts, the settlement of which belonged to him exclusively, and that such settlement could be made by him personally, or through such of his subordinates as he might designate for that purpose. In *Rice, Assignee,* v. *United States*, 21 C. Cl. 413, 419, it was said by Richardson, C. J., who was entirely familiar with the mode of conducting business in the Treasury Department, that "while Mr. Chase was Secretary of the Treasury, and for some time afterwards, the money received from captured and abandoned property was merely *deposited with the Treasurer*, and was not technically, in departmental language, 'covered into the Treasury;' and so, according to the construction then given by the Department, was not subject to the constitutional provision that, 'no money shall be drawn from the Treasury but in consequence of appropriations made by law.' Constitution, Art. I.

§ 9, par. 6.   More than two and a half millions of it was paid out by Secretaries Chase, Fessenden, and McCulloch (*Hodges' Case*, 18 C. Cl. 704) without any appropriations therefor, when Congress interposed and passed the joint resolution of March 31, 1868.   15 Stat. 251."   By that joint resolution, it was provided that " all moneys which have been received by any officer or employé of the Government, or any Department thereof, from sales of captured and abandoned property in the late insurrectionary districts, under or under color of the several acts of Congress providing for the collection and sale of such property, and which have not already been actually covered into the Treasury, shall immediately be paid into the Treasury of the United States, together with any interest which has been received, or accrued thereon."   The language of this resolution affords some evidence that Congress was aware of the manner in which the several acts relating to captured and abandoned property had been executed, and did not intend to disturb what had been previously done under the practice prevailing in the Treasury Department.

In view of the foregoing facts the case comes fairly within the rule often announced by this court, that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous.   *Edwards* v. *Darby*, 12 Wheat. 206, 210 ; *United States* v. *Moore*, 95 U. S. 760 ; *Hahn* v. *United States*, 107 U. S. 402 ; *United States* v. *Philbrick*, 120 U. S. 52, 59.

We have said that the approval by the Secretary of the Treasury of an agent's account of expenses in the collection and sale of captured and abandoned property would not be conclusive, if it appeared either that such approval was procured by fraud, or that such expenses were incurred in violation of some positive statute, or in contravention of public policy.   Much was said at the argument to the effect that the transactions of the defendant were based upon fraud; that he withheld or suppressed evidence that it was in his power

to produce; and that what he did was calculated to debauch
military officers to whom money was paid by him for the per-
formance of services, in respect to which they were forbidden
by law to accept compensation. It is only necessary to say
that the findings of fact do not sustain these propositions.
The record contains nothing to justify this court in holding
that the defendant had been guilty of any fraud that would
invalidate the settlement of his accounts with the Government.
Taking the findings of fact to be correct, as is our duty to do,
we must assume that the payments made by the defendant,
of the allowance of which complaint is now made, "were made
necessary by the unsettled state of the country, the great
accumulation of the cotton which the railroad company was
unable to transport, the danger of theft and robbery, and the
interference of other agents or persons claiming to be agents
of the Treasury Department, and of military officers;" and,
in respect to what are called military payments, that they
"were all made in the *bona fide* belief that they were neces-
sary to protect the interests of the United States in the cotton,
to secure increased vigilance, or to prevent connivance with
parties interfering with or attempting to interfere with the
cotton." The utmost that the record establishes is that there
were irregularities, perhaps carelessness, in the final closing
of defendant's account with the Government. It may be that
he should have been required to present more satisfactory evi-
dence than it may be supposed from the record he did in fact
present. These considerations, however, even if entitled to
weight as matter of law, lose much force after the lapse of
years without action upon them by the Government. The
defendant ought not now to be held to the same strictness of
proof that might justly have been required of him when all
the circumstances connected with the cotton in question could
have been readily established by competent evidence. We
are of opinion that no case is made by the Government to in-
validate the settlement of defendant's accounts. We concur
with the referee when he says that "it would be an exceed-
ingly dangerous doctrine that settled accounts where the
United States had acted on the settlement and paid the bal-

ance found due on the basis of that settlement, could be opened or set aside, merely because some of the prescribed steps in the accounting which it was the duty of a head of a department to see had been taken, had been in fact omitted; or, if they could be so opened and set aside on account of technical irregularities in the allowance of expenses years afterwards, when the remedy of the party against the United States is barred by the statute of limitations, and the remedies of the United States on the other side are intact, owing to its not being subject to any act of limitation."

The facts found being sufficient to support the judgment, it is

*Affirmed.*