### LYNCH v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 5, 1905.)

#### No. 1,119.

1. PUBLIC LANDS—CUTTING TIMBER—ACTIONS—EVIDENCE—VALUE—PREJUDICE.
   Where, in an action by the United States to recover the value of timber alleged to have been wrongfully cut from the public domain, the government's evidence that 500,000 feet of lumber had been cut was uncontradicted, and the jury rendered a verdict in its favor for $500 only, de-

fendant was not prejudiced by the admission of evidence, on the issue of the value of the lumber, that timber had been sold in the vicinity by the state for $2.10 per thousand.

2. SAME—ADMISSIBILITY.

Where, in an action by the United States for the value of timber alleged to have been wrongfully cut from the public domain, a witness asked as to the value of timber in that neighborhood stated that he knew only by the price set by the state, which had been fixed by appraisement made by state officers, as required by Pol. Code Mont. § 3560, and that that price was $2, he was also entitled to testify, in answer to a question of the court as to whether any was sold at that price, that some was sold for $2.10 per thousand.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 416–421.]

3. SAME—CHARACTER OF LAND.

Where defendant's right to cut and remove timber in question from the public domain was dependent on the land being mineral, and not subject to entry except for mineral entry, as provided by Act Cong. June 3, 1878, c. 150, 20 Stat. 88 [U. S. Comp. St. 1901, p. 1528], and there was testimony that the region had been prospected, and, though float was found over it, no mineral-bearing veins had been discovered, and that small tracts near defendant's mill were cultivated for crops, evidence that a witness cultivated to crops about three acres of ground on the flat near the creek, on which the land from which the timber in controversy was cut adjoined, and that such ground was suitable for agriculture, was admissible.

4. SAME—EXPERTS.

On an issue as to whether land from which defendant was charged to have unlawfully cut timber belonging to the United States was mineral land, a placer miner of 70 years' experience, and familiar with a creek running through the land, but not shown to have had any knowledge of the locality from which the timber was cut, was not entitled to give his opinion that ground along the "bed of the creek nearest to the place where the timber was cut" contained gold in quantities that would pay to extract; there being no evidence that gold in any quantity had been found in that part of the creek in that vicinity, or where the timber was cut.

5. SAME.

On an issue as to the character of certain land, from which timber was alleged to have been wrongfully cut, the question whether such land was mineral land was not a subject of expert opinion; the jury being competent to determine such issue from the facts on which the opinion was based.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 2328.]

6. SAME—CLASSIFICATION OF LAND—RECORDS.

Where, on an issue as to the character of public land from which timber was alleged to have been wrongfully cut, the register of the land office testified as a witness for defendant that the land in question had been classified as mineral land by the classification commissioners appointed to classify lands in Montana and Idaho, to adjust a claim of the Northern Pacific Railroad Company, as provided by Act Cong. Feb. 26, 1895, c. 131, 28 Stat. 683, the United States was entitled to show by the witness, in rebuttal, that the records of his office also showed that certain of the lands in the township in question had been patented as homesteads, and that other lands therein had been entered under the provisions of the forest reserve act, and still others had been selected by the state under its grant and by the Northern Pacific Railroad Company, all of which selections were nonmineral.

7. SAME—CLASSIFICATION ACT—CONSTRUCTION BY LAND DEPARTMENT.

The ruling by the Secretary of the Interior that the classification of land in the states of Montana and Idaho as mineral by land commissioners appointed as provided by Act Cong. Feb. 26, 1895, c. 131, 28 Stat. 683,

did not prevent the land department from making such disposition of the lands as would be proper, on a subsequent showing that the land was not in fact mineral, and that such classification was not conclusive on the United States, was not error.

3. SAME—REQUESTS TO CHARGE.

Requests to charge may be properly refused where they are substantially covered by instructions given.

In Error to the District Court of the United States for the District of Montana.

This action was brought by the United States to recover from the defendant, John Lynch, the sum of $4,000, alleged to be the value of 500,000 feet of lumber manufactured from timber cut and removed by the defendant from unsurveyed lands of the United States, which lands, when surveyed, will be within township 16 north, of range 26 west, in the state and district of Montana. The defendant, in his answer, denied that the plaintiff was the owner of the lumber mentioned in the complaint, but admitted that the lumber had been manufactured out of timber or logs cut from lands which will be township 16 north, of range 26 west of the Montana meridian. He denied that the lumber referred to in the complaint was of the value of $5,000, or any sum greater than $2,500, or that any interest the plaintiff might have in the same was of any greater value than $250. For a further and separate defense, the defendant admitted the cutting of the timber, and that he converted the same to his own use, but justified his action by averring that he was a citizen of the state of Montana, and entitled, under the laws of the United States, to enter upon public lands of the United States in the state of Montana, which were strictly mineral in character, and not subject to entry except for mineral purposes, and to cut therefrom certain timber, in accordance with the rules and regulations prescribed by the Secretary of the Interior, to manufacture the same into lumber, and to sell and dispose of the same to residents of said state for use therein for mining purposes. The defendant averred that the land in controversy was such mineral land owned by the United States, and that his action in cutting the timber and converting it to his own use was strictly in accordance with his right under the laws, and was done in good faith.

It appears from the testimony that the defendant had a mill on what will be, when surveyed, section 9 of township 16 north, range 26 west of the Montana meridian, and had cut timber from sections 5 and 8 of the same township; that sections 5 and 9 are within a grant from the United States to the Northern Pacific Railroad Company; that section 8 is the property of the United States. The witness Schwartz, special agent of the General Land Office, testified that he went over the land, counted the stumps, and made an estimate of the amount of timber that had been cut. He found that about 1,000 trees had been cut from section 8, and that these trees would make about 500,000 feet of lumber—the amount of lumber alleged in the complaint as having been taken by the defendant. Testimony was introduced by both parties regarding the character of the land, from which it appears that the ground is broken and mountainous—in places very steep; that a creek runs through the section, along which, from 1870 to 1876, considerable placer mining was engaged in. There was conflicting testimony as to the present character of the land. The register of the land office in that district testified that all of the unsurveyed portions of said township had been classified as mineral by the mineral land commission appointed pursuant to the act of Congress of February 26, 1895, for the examination and classification of certain mineral lands in Montana and Idaho, but, when recalled as a witness for the government, he further testified that certain sections of the township, other than section 8, were entered under the homestead and forest reserve acts, and certain odd-numbered sections were selected by the Northern Pacific Railroad Company under its grant. Testimony was also introduced to the effect that there were patches of cultivated ground, of a few acres each in extent, in the immediate vicinity of the defendant's mill, and along the creek on the land in question.

The case was tried with a jury, resulting in a verdict in favor of the United States in the sum of $500. Judgment was entered thereupon, and the case brought to this court for its reversal.

T. J. Walsh, for plaintiff in error.

Carl Rasch, U. S. Atty.

Edward E. Cushman, Special Asst. Atty. Gen.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The plaintiff called as a witness one Chadwick, who was asked the following questions:

"Q. What is the value of timber in that neighborhood, if you know—in the growing tree? A. I only know that by the price set by the state. Q. State what that is. A. Two dollars. The Court: Q. Do you know whether there was any sold for that? A. Yes, sir; there was some sold at Florence at $2.10, I think."

The defendant objected to this testimony on the ground that it related to specific sales of timber; that the knowledge of such sales did not qualify the witness to testify as to the value of the timber. The plaintiff alleged in the complaint that it was the owner of 500,000 feet of lumber cut and removed from land of the United States; that the defendant wrongfully and unlawfully took possession of the same and converted the same to his own use. The defendant in his answer admitted the cutting of the timber, and that he converted the same to his own use, but he justified the cutting and the appropriation upon the ground that he had a right under the law to do so, for the reason that the land upon which the timber in question was cut was mineral land of the United States. There was no question raised by defendant's answer as to the amount of timber cut and removed by the defendant, and the only issue raised as to the value of the timber was that it was not of the value of $5,000 ($4,000), or any sum greater than $2,500, or that any interest in the same was of any greater value than $250. What was meant by the denial that plaintiff's interest in the lumber was of greater value than $250 is not clear. Possibly it had relation to the fact that the Northern Pacific Railroad Company claimed to own the odd-numbered sections in that township, while the government had retained the title to the even-numbered sections, and that the charge in the complaint was that the defendant had cut timber from lands in the township generally. But however that may be, the specific denial was that the 500,000 feet of timber cut and removed by the defendant was of any greater value than $2,500.

The evidence on behalf of the government as to the amount of timber cut was the testimony of Schwartz, the special agent of the General Land Office, who testified that he found that 1,000 trees had been cut from section 8, and that these trees would make about 500,000 feet of lumber. There was also testimony as to the value of this timber in the trees. The witness Vogel, who was the agent of the Blackfoot Milling Company, testified upon direct examination that timber at the railroad station nearest the place where the timber in question was cut was worth $8 per thousand,

and that it would cost $7.50 to cut and manufacture it and place it on the cars ready for shipment. He further testified that timber in the trees was worth $1.50 per thousand. On cross-examination he testified that his company had purchased the stumpage (that is, the right to cut and remove the timber) on all land granted to the Northern Pacific Railroad Company in the vicinity of the lands in question, at 50 cents per thousand feet.

The court instructed the jury that if they believed from the evidence that the defendant had good reason to believe, and in good faith did believe, he had a right to cut and appropriate the timber he manufactured into lumber, described in the complaint, and also found, under the law and the evidence, that he had no such right, then the plaintiff was entitled to recover, not the value of the manufactured lumber, but merely the value of the timber as it stood in the land before being cut, and, if they found that the land from which was cut the timber manufactured into the lumber mentioned in the complaint was not mineral land, they could not find for the plaintiff for the value of any lumber, except such as was cut by the defendant on section 8 prior to May 15, 1902.

As before stated, the only evidence on behalf of the plaintiff as to the amount of timber cut was the testimony of the special agent of the land office, who testified that he found that 1,000 trees had been cut from section 8, and that these trees would make about 500,-000 feet of lumber. This evidence was not contradicted. Upon this testimony, and under the instructions of the court, the jury found for the plaintiff, and fixed the damages at $500. It is evident that the defendant was not prejudiced by the testimony of Chadwick that the timber in a growing tree was worth about $2 per thousand, since the only inference that can be drawn from the testimony is that the jury fixed the value at $1 per thousand on the 500,-000 feet of lumber cut and removed from section 8, as determined by the examination made by the special agent of the land office. But, aside from this view of the testimony, we think the evidence was properly admitted. The testimony of the witness as to the specific sale made by the state was given after he had stated what the value of the timber was, and was given in answer to a question by the court, "Do you know whether there was any sold for that?" This question was asked for the purpose of ascertaining what knowledge the witness had upon the subject of sales made by the state, and was relevant to the question as to the qualification of the witness, and his answer that some was sold at Florence at $2.10 informed the court as to his knowledge of sales made by the state. His previous answer as to the value of timber in the growing tree in that neighborhood was based upon the price fixed by the state for its timber. Whether this evidence was admissible or not was another question, and was not raised by the objection to evidence of specific sales. However, we think the evidence was admissible. The value here referred to was one fixed by appraisement made by officers of the state under the statutory authorities. 1 Pol. Code Mont. § 3560. If it was not correct, defendant was at liberty to show this fact by other testimony. In fact, as has been stated, the

jury did not accept this valuation, but, upon other testimony furnished by the plaintiff, it fixed a much less valuation.

The plaintiff introduced evidence to the effect that this region had been prospected, and, though float was found over it, no mineral-bearing veins had been discovered, and evidence was submitted to the effect that there was no vein at the place where the evidence of the defendant tended to show that a vein had been discovered. Testimony was introduced to show that a vein bearing copper had been discovered about a mile and a half north of the place where the timber cutting was done. There was also testimony to the effect that four small tracts of land—two embracing about three acres each, and one about ten acres, and one about eight acres, two within 1½ miles above the Lynch mill, and the other about a half a mile below—were cultivated for crops. Plaintiff called one Upham as a witness, who testified that he cultivated to crops about three acres of ground on the flat near the creek, and that such ground was suitable and adapted to agriculture. To the introduction of this testimony the defendant objected on the ground that the same was immaterial, irrelevant, and incompetent. The objection was overruled by the court, and the defendant excepted. The testimony was admitted, and also other testimony to show that various tracts of land along the bed of the creek adjacent to the Lynch mill were cultivated to crops; that the same and more of the flat and of the benches were suitable for and adapted to agricultural purposes. We think the testimony of the witness Upham was properly admitted. The right of the defendant to cut and remove timber from this land was dependent on the land "being mineral and not subject to entry under existing laws of the United States, except for mineral entry." Act June 3, 1878, c. 150, 20 Stat. 88 [U. S. Comp. St. 1901, p. 1528]. Was the land mineral, and subject to entry as such under the laws of the United States, or was it agricultural land? The question of the character of land is always one of fact, and what evidence is more satisfactory than the actual use to which it has been placed by those who occupied it and made it a means of livelihood? It may not be conclusive evidence, since there are many instances where valuable mineral deposits have been found in ground devoted to other than mining purposes, and where such deposits were not supposed to exist. But nevertheless this testimony as to the actual use of the land tends to establish its character, and clearly is relative and material for that purpose.

Among other witnesses the defendant called to the stand was one Kline, who testified that he mined on Cedar creek in 1870, and had been engaged in placer mining for many years, and that he had been for many years familiar with the region about the Lynch mill. The defendant offered to prove by this witness that, in view of his acquaintance with the ground and the indications found there, in his opinion the ground along the bed of the creek at the place where the alleged cutting was done contained gold in quantities that would pay to extract. The United States attorney objected to this evidence, and the objection was sustained. The ruling of the court in sustaining this objection is assigned as error. The plaintiff in

error contends that this was expert testimony; that the witness had qualified himself fully to testify; that he had worked as a placer miner on Cedar creek in 1870, and had been engaged in placer mining for a great many years; that he had been for many years familiar with the region about the Lynch mill; and that his opinion was therefore competent evidence. It appears from the testimony that Cedar Creek rises in a range of mountains, and is about 25 miles in length; that gold was discovered on this creek in 1870. The principal diggings were about 18 or 20 miles up the creek, and extended down to the mouth of the tributary known as "Oregon Creek," which empties into Cedar creek about 10 miles from its mouth. A placer claim was patented about the year 1891, extending some distance above the mouth of Oregon creek, and below it to within one-half a mile of the Lynch mill; but, except such as may have been extracted on the doing of the work upon which the claim was patented, of which no evidence was given at the trial of the cause, no gold was ever taken from the gravel below the mouth of Oregon creek. The southeast corner of section 8 touches Cedar creek about 2½ miles above its mouth, where it empties into the Missoula river, and about 7½ miles below the mouth of Oregon creek. It does not appear from the record at what point on Cedar creek the witness had mined in 1870, nor does it appear where he had been engaged in placer mining for many years, or in what respect he was familiar with the region about the Lynch mill. The Lynch mill was located on the northwest quarter of section 9. The timber cutting in controversy was from the slopes of the mountain on the north half of section 8. There is nothing in the record tending to show the knowledge of the witness of that locality, or his experience as a miner in that vicinity. The offer to prove by the witness that, in his opinion, the ground along the bed of the creek nearest the place where the timber cutting was done contained gold in quantities that would pay to extract, assumed that he had a knowledge of that locality and of the locality where the timber was cut which the evidence did not justify, and his opinion that there was gold in the bed of the creek, without evidence that gold in any quantity whatever had been found in that part of the creek or in that vicinity, or where the timber was cut, would appear to be without value. Moreover, he was not an expert in the sense that he had a special knowledge which qualified him to draw conclusions from facts that the jury was not competent to do. Had the jury been informed of the facts upon which the opinion was to be based, they would have been as competent as the witness to draw a conclusion with respect to that question. The ruling of the court was correct.

The act of Congress entitled "An act to provide for the examination and classification of certain mineral lands in the state of Montana and Idaho," approved February 26, 1895 (28 Stat. 683, c. 131), provides for the examination and classification by commissioners appointed by the President of the United States of the lands within the limits of the grant to the Northern Pacific Railroad Company in the states of Montana and Idaho. The classification was

to be with special reference to the mineral or nonmineral character of such lands, and was for the purpose of adjusting the claim of the Northern Pacific Railroad land grant. By the sixth section of the act, the classification, where no protest was filed against the same, and when approved by the Secretary of the Interior, became final, and the tract classified as mineral was excepted from the grant to the railroad company. But this classification did not prevent other disposition of the land by the government when returned as mineral, should subsequent investigation prove certain tracts to be nonmineral in character. The classification was to be considered as of the same effect as the return of mineral lands made by the government surveyor. The Instructions of Secretary of Interior to Commissioner of General Land Office, dated November 30, 1897, 25 Public Land Decisions, 446, 447.

The defendant called as a witness Daniel T. Armes, the register of the United States land office at Missoula, Mont., who testified that all of the unsurveyed portions of township 16 north, of range 26 west, had been classified as mineral by the commissioners appointed under the act above mentioned. This witness was also called by the plaintiff in rebuttal, and was asked what the records of his office showed in regard to entries of lands in this township under acts providing for the entry of nonmineral land. The defendant objected to this testimony on the ground that the fact that entries had been made of lands in the township as agricultural lands outside of the lands in controversy was incompetent, irrelevant, and immaterial. The objection was overruled, and the defendant excepted. The witness testified that certain subdivisions of the township had been patented as homesteads; that certain others had been entered under the provisions of the forest reserve act, and still others selected by the state under its grant; and that the Northern Pacific Railroad Company had selected certain odd-numbered sections under its grant. All these selections were nonmineral. The general classification of the lands of the township as mineral lands by the mineral land commissioners was deemed by the court prima facie evidence that the land was mineral, and that the burden was on the government to show that the land was not mineral. In this aspect of the case, we think it was permissible for the government to show that to this classification there were exceptions, which it had recognized and approved in issuing patents on homestead entries made within the township, and entertaining claims for other sections and subdivisions as nonmineral tracts. If the defendant was entitled to introduce in evidence the action of officers of the government classifying the lands in this township as mineral, clearly the plaintiff was entitled to have in evidence the entire action and record of the government with respect to the character of this land. In other words, the plaintiff was entitled to have the evidence of the entire transaction, and the complete record of the government with respect to this land. It is to be observed further that section 6 of the act of February 26, 1895, required that the records of the local and general land offices should be made to conform to the classification as determined by the commissioners and

approved by the Secretary of the Interior. When the witness Armes testified that all the unsurveyed portions of township 16 north, of range 26 west, had been classified as mineral by the mineral land commission, he was testifying as to what appeared of record in his office as register. The general rule is that records, when used in evidence to prove the facts therein contained, must be produced entire. The reason assigned for it is that the part of the record which is lacking may give the rest a different meaning. McGuire v. Kouns, 7 T. B. Mon. 386, 18 Am. Dec. 187; 3 Wigmore on Evidence, § 2110. The rule is applicable to this case, where the question was as to what the records disclosed as to the character of the land in the township, and this could only be done by the whole record upon that subject.

It is assigned as error that the court refused to instruct the jury that the government was bound by the classification made by the mineral land commission, and could not be heard to impeach such determination by asserting that the land was not mineral. The Secretary of the Interior construed the act of February 26, 1895, very soon after it was passed, as intended to facilitate the adjustment of the grant of land to the Northern Pacific Railroad Company, by enabling the Secretary of the Interior to ascertain without delay what lands within the limits of the grant to said company in the states of Montana and Idaho were mineral in character, and excepted from the operation of the grant. The Secretary also determined that the classification of land as mineral under the act did not prevent the Land Department from making such disposition of the land as would be proper upon a subsequent showing that the land was not in fact mineral. 25 Land Decisions, 446, 447; 26 Land Decisions, 423, 424. This construction of the statute has been the law of that department upon this subject for nearly eight years, and, as far as we are advised, it has not before been questioned. The contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous. United States v. Johnston, 124 U. S. 236, 253, 8 Sup. Ct. 446, 31 L. Ed. 389. We find no reason advanced in the defense to this action for holding that the construction placed upon the statute by the Secretary of the Interior is erroneous.

The remaining questions involved in the refusal of the court to give certain specified instructions to the jury, as requested by the defendant, need not be discussed. The court gave instructions covering substantially the same ground, but in different language. So far as they departed from the requested instructions in material substance, we have already sufficiently indicated in this opinion that they are correct.

The judgment of the District Court is affirmed.