Booth, J.,
delivered the opinion of the court:
This suit is brought to recover duties paid by the claimant alleged to be in excess of the amount lawfully due on its *13 average circulation during certain semiannual periods between July, 1887, and July, 1904, as more fully appears in the findings.
The taxes here in controversy were collected by the Treasurer of the United States by virtue of section 5214 of the Bevised Statutes:
“ In lieu of all existing taxes every association shall pay to the Treasurer of the United States, in the months of January and July, a duty of one-half of one per centum each half year upon the average amount of its notes in circulation.”
The claim is predicated upon Bevised Statutes, section 3411:
“ Whenever the outstanding circulation of any bank, association, corporation, company, or person is reduced to an amount not exceeding five per centum of the chartered or declared capital existing at the time the same was issued, said circulation shall be free from taxation.”
Claimant contends that section 3417 of the Bevised Statutes effectuates section 3411 (supra) as a limitation upon the exaction of duty under section 5214, Bevised Statutes (supra), so that when the average amount of its circulation was not in excess of 5 per cent of its capital it was exempt from payment of the same.
Section 3417 is as follows
“ The provisions of this chapter, relating to the tax on the deposits, capital, and circulation of banks, and to their‘returns, except as contained in sections thirty-four hundred and ten, thirty-four hundred and eleven, thirty-four hundred and twelve (thirty-four hundred and thirteen), and thirty-four hundred and sixteen, and such parts of sections.thirty-four hundred and fourteen, and thirty-four hundred and fifteen as relate to the tax of ten per centum on certain notes, shall not apply to associations which are taxed under and by virtue of title £ National banks.’ ”
The statutes here in controversy were originally enacted at a time when the Congress had under special consideration the provision of a uniform and stable currency. It is deemed unnecessary to advert in detail to the historical incidents of the times leading up to and culminating in the passage of the act of February 25, 1863, known as the national banking act. No tax of any character upon the circulation *14 of a bank had been imposed until the act of February 25, 1863. This statute did not, however, impose any tax upon the circulation of State banks. It provided in terms and under penalty that any bank not coming within the provisions of the statute issuing notes intended to circulate as money should make return thereof semiannually to the Comptroller of the Currency. The act of March 3, 1863 (12 Stat. L., 112), was the first statute imposing a tax upon the circulation of State banks. Section 7 of this act imposed a graduated tax upon the circulation of State banks in proportion to the average amount of the same, as in terms enumerated therein; it likewise provided for a similar tax upon the circulation of national banks to be assessed and collected under the national banking act.
Section 7 appears under and is a part of the act of March 3, 1863, entitled “An act to amend an act entitled ‘An act to provide internal revenue to support the Government and pay interest on the public debt.’ ”
The act of June 30, 1864 (13 Stat. L., 277), being an act to provide wa3>'s and means for the support of the Government, continued the tax upon the average circulation of State banks, but in express terms exempted from its operation all “ associations which are taxed under and by virtue of the act to provide a national currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof,” leaving the act of June 30, 1864, in so far as the imposition of a tax upon the circulation of banks is concerned, applicable only to those banks and banking-associations not organized under the act of February 25,1863. The tax imposed upon the circulation of State banks by the act of June 30, 1864, was identical with the former tax, save only as to method of payments. Observable in this connection is the fact that from and after the passage of the act of March 3, 1863 (sufra), the imposition of taxes upon the.circulation of State and national banks per se was no longer combined in one statute, being entirely divorced and considered by the Congress under separate and distinct titles, the imposition of taxes upon the circulation of State banks appearing under the title of internal revenue and those of national banks under the national banking act.
*15 The act of July 13, 1866 (14 Stat. L., 136), provides for a continuation of the tax upon the average circulation of State banks, section 110 of said act being subsequently carried into the Bevised Statutes as section 3408.
Section 44 of the act of June 3, 1864 (13 Stat. L., 112), provides for the conversion of State banks into national banks, and section 14 of the act of March 3, 1865 (13 Stat. L., 484), relating to the same subject, provides in terms as follows:
“ That the capital of any State bank or banking association which has ceased or shall cease to exist, or which has been or shall be converted into a national bank, for all the purposes of the act to which this is an amendment, shall be assumed to be the capital as it existed immediately before such bank ceased to exist or was converted as aforesaid. And whenever the outstanding circulation of any bank, association, corporation, company, or person shall be reduced to an amount not exceeding five per centum of the chartered or declared capital existing at the time the same was issued, said circulation shall be free from taxation. And whenever any State bank or banking association has been converted into a national banking association, and such national banking association has assumed the liabilities of such State bank or banking association, including the redemption of its bills, such national banking association shall be held to make the required return and payment on the circulation outstanding, so long as such circulation shall exceed five per centum of the capital before such conversion of such State bank or banking association.”
Said section 14 as amended by section 9 of the act of July Í3, 1866 (14 Stat. L., 146), was carried into the Bevised Statutes as sections 3410 and 3411. Standing in separate sections it is misleading. The two sections should be considered as one, as in the original act, to arrive at their true meaning. The evolution of the legislation effecting taxes upon the circulation of State banks which Ave have traced clearly indicates an intention upon the part of the Congress, from and after the passage and successful operation of the national banking act, to retire State bank circulation.
Section 6 of the act of March 3, 1865 (supra), providing for a tax of 10 per cent on the amount of notes of any State bank paid out by any national or State banking association after July 1, 1866, manifestly was intended as cumulative *16 and restrictive legislation, tending to diminish the existence of State banks and encourage, if not compel, their conversion into national banks. Sections 7 and 14 of the act of March 3, 1865, reenforce the contention by offering the additional inducement of relief from taxation to all State banks converted under this act into national banks upon all their circulating medium below 5 per cent of their charter or declared capital issued and emitted under State organization.
The Congress was dealing with State banks and State banking associations in enacting the legislation culminating in the passage of sections 3411 and 3417 of the Bevised Statutes. The exceptions contained in section 3417 of the Revised Statutes manifestly were intended to cover the tax imposed upon the circulation of State banks taken over and assumed by national banks upon their conversion into a national bank and not upon the average circulation of a national bank as such.
And this is clear from section 9 of the act of July 13, . 1866 (14 Stat. L., 146), carried into the Revised Statutes as sections 3410, 3411, 3412, and 3416, the latter of which sections provides, in substance, that when a national bank assumes the liabilities of a State bank such national bank is thereby required to pay the tax on the circulation of such State bank so long as it exceeds 5 per cent of. the capital before such conversion of such State bank or banking association.
Section 19 of the act of February 25, 1863 {supra), after providing for the procurement and control of plates and special dies for the printing of national-bank notes, by the Comptroller of the Currency, expressly charges the expense thereof to the contingent fund of the Treasury Department, and for the purpose of reimbursing the Treasury Department, and “ all other expenses incurred under this act, and in lieu of all taxes upon the circulation authorized by this act,” imposes a semiannual tax of 2 per cent on the amount of circulating notes received by any national bank.
Section 41 of the act of June 3, 1864 (13 Stat. L., 110), provided for the payment of the expenses incurred in administering the national banking act by the Bureau of the Comptroller of the Currency out of the proceeds of the taxes or *17 duties assessed on the circulation of national banks. The act reduced the tax on the average circulation of a national bank to 1 per cent, payable semiannually, and, to provide for whatever deficit thereby caused, extended a small tax upon deposits and capital stock of each association — a pronounced encouragement to such associations to increase their average circulation under the provisions of the act. Section 41 of the act of June 30, 1864, was carried into the Revised Statutes as section 5214, and the tax imposed by the act of June 3, 1864, remains the same, except as amended by section 13 of the act of March 14, 1900.
The duty imposed upon the circulation of a national bank ' by the act of February 25, 1863, has been decreased as to amount by succeeding Congresses, but never increased or discontinued. The act of February 25, 1863, as before observed, imposed no tax upon the circulation of State banks, their circulating medium being the only currency of the country at the time of its passage. Subsequent legislation as respects the circulation of State banks, beginning with the act of March 3, 1863, and culminating in the enactment of sections 3408 and 3412, Revised Statutes, not only continues the .tax upon the circulation of the State bank issuing and emitting the same, but extends to it, and to all other banks of whatever character, a- tax of 10 per cent “ upon the notes of any person, or any State bank or State banking association, used for circulation and paid out by them.” This later legislation, having accomplished its ultimate purpose, viz, the retirement of State-bank circulation, it became expedient to modify its harshness, as well as to encourage the organization of national banks by limiting its application to the extent of taxing only so much of the average circulation of State banks, subsequently converted into national banks, as exceeded 5 per cent of its chartered or declared capital, as was done by section 3411, Revised Statutes. It is clear that sections 3411 and 3412, though applicable to separate and distinct impositions of taxes, could have no other effect than to promptly reduce State-bank circulation to the minimum exempted from taxation by the 5 per cent clause. It is difficult to perceive how extended *18 circulation of State-bank currency could obtain under section 3412, Revised Statutes. That the legislation affecting State banks and State-bank circulation did accomplish the purpose for which it was designated is fully demonstrated by the entire absence of State-bank notes as a part of our circulating medium.
The policy of the Congress in dealing with national banks has been decidedly in favor of encouraging the issue and emission of their circulating medium. The act of March 14, 1900, permitting the issue and emission bj^ national banking associations of circulating notes equal in amount to the par value of the United States bonds deposited to secure the same, was a recognition of the public demand for increased amount of currency. The most potent criticism against the entire system of national-bank circulation has been its inability to at all times meet urgent demands for more currency. To hold that section 3411 of the Revised Statutes operated as a limitation upon the collection of a duty specifically imposed to defray the expenses of carrying into operation the national banking act, would be in direct contradiction of the intention of the Congress manifested in the enactment of the same. It would tend as an inducement to decrease circulation of national banks and thus directly defeat the result sought to be acomplished by the act of March 14, 1900 (supra), and all prior legislation upon the same subject.
While the terms “ tax ” and “ duty ” have been employed in the phraseology of the statutes upon this subject, still in legal signification the amount imposed upon the average circulation of national banks by section 5214, Revised Statutes, is not a revenue measure. Mr. Justice Harlan, in Twin City Bank v. Nebeker (167 U. S., 203), speaking directly upon the subject, uses this language:
“ The main purpose that Congress had in view was to provide a national currency based upon United States bonds, and to that end it was deemed wise to impose the tax in question. The tax was a means for effectually acomplishing the.' great object of giving to the people a currency that ■would rest, primarily, upon the honor of the United States and be available in every part of the country. There was no purpose by the act or by any of its provisions to raise revenue *19 to be applied in meeting the expenses or obligations of the Government.”
Sections 3411 and 5214, Revised Statutes, are not acts in pari materia; they have distinct and separate applicability. One supplemented by section 3412, Revised Statutes, is part of a general legislative scheme limited by every intendment of law to the control and suppression of a currency system founded, as was said by Chief Justice Chase in Veazie Bank v. Fenno (supra), wherein the act of March 3, 1865, was under consideration on “ Bank notes issued by numerous independent colorations variously organized under State legislation, of various degrees of credit and very unequal resources, administered often with great, and not unfrequently with little skill, prudence, and integrity.” The other was and is a legislative imposition of a small duty, so inconsequential as not to prohibit or restrict the issue and emission of a currency proven by experience to rest upon a solvent system and to assist in part in the payment of the expenses of the bureau of the Government charged with the administration of the national banking act.
__ Section 5173, Revised Statutes, appropriates the sums realized from taxes imposed by section 5214 to the payment of the expenses incurred by the Comptroller of the Currency in procuring plates and dies for the printing of circulating notes of national banks. It is insisted that the Congress, having employed the general word,' “ Whenever the outstanding circulation of any bank,” ex vi termini must have intended to include national as well as State banking associations within its operation.
In giving effect to a statute courts are charged with the duty of ascertaining the legislative intent. When the language employed is clear and free from ambiguity the words are to be given their common and usually accepted meaning as applied to the subject-matter with regard to which they are used; but where a general word follows one or more particular and specific words of the same nature as itself its meaning is derived from them, and it is restricted to the sanie genus as the particular words. The principle of ejus-dem generis applies. As before observed, sections 3410 and *20 3411, as they appear in the Revised Statutes, are misleading; they should be construed together as in the original enactments, wherein the subject-matter is treated in one sentence. In the revision the one sentence is divided into sections. 3410 and 3411, omitting the conjunction “ and,” which in the original act connects the two clauses of a single sentence. Courts are not precluded by the language of a statute, when in doubt as to the scope of the act, from going beyond it to ascertain legislative intention. The object to be accomplished by the act, keeping in view the conditions existing at the time of its passage, is of paramount importance in giving effect to statutes of doubtful meaning. (Endlich on Interpretation of Statutes, sec. 86, p. 115; United States v. Moore, 95 U. S., 760.) In Smythe v. Fiske (23 Wall., 380), cited in defendants’ brief, the court said: “A thing may be within the letter of a statute and not within its meaning, and within its meaning but not within its letter. The intention of the lawmaker is the law. * * * Where doubt exists as to the meaning of a statute, the title may be looked to for aid in its construction. The preexisting law and the reason and purpose of the new enactment are also considerations of great weight.”
While courts in the construction of acts appearing in the Revised Statutes are precluded from referring to antecedent legislation upon the same subject to “ create ” an ambiguity, they are not so precluded to “ solve ” an existing one. Mr. Justice Brown, in Hamilton v. Rathbone (175 U. S., 419), says: “ The general rule is perfectly well settled that where a statute is of doubtful meaning and susceptible on its face to two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction.” To invoke a different rule the act when standing alone must be fairly susceptible of but one construction. (Hamilton v. Rathbone, supra). To the statutes in question the latter rule can have no application.
For forty years the Treasury Department officials have construed the statutes here in question in accordance with *21 the conclusions reached by the court in the case at bar. Such long-continued construction and practice by the Departments charged with the administration of a statute will not be set aside by the court except • for cogent reasons. Courts are slow to intervene and overrule the same, unless it appears that the construction so given is clearly wrong. (United States v. Johnston, 124 U. S., 236; United States v. Finnell, 185 U. S., 236.)
We are therefore of the opinion that the petition should be dismissed.
Petition is dismissed.