BarNey, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This is a suit brought by the State of Massachusetts by virtue of the following jurisdictional act of Congress, which speaks for itself as to its purpose:
“That the claim of the State of Massachusetts for premium paid for com with which it paid the interest and principal of its bonds issued in the year eighteen hundred and sixty-one for money borrowed and used to furnish troops of the State for the service of the United States during the Civil War; and also its claim for interest and premium paid for coin in payment of such interest, on bonds issued for money borrowed and expended at the request, during said war, of the President of the United States, in protecting the harbors and fortifying the coast, which claims were rejected by the Comptroller of the Treasury Department, be, and the same are hereby referred to the Court of Claims for determination of the law and the facts, and report, to Congress. The evidence of the amount of said expenditures and of the computations of such premiums made by the accounting officers of the Treasury on file in said department, as furnished by the State, may be considered by the court so as to relieve the State of the necessity of again filing said evidence in court.”
It will be seen that this act provides for the consideration of two claims; first, the claim for the State of Massachu *317 setts on account of premium paid for coin in payment of interest on bonds issued for money borrowed and expended to furnish troops of the State for the service of the United States during the Civil War; second, its claim for interest and premium paid for coin in payment of such interest on bonds issued for money borrowed and expended during said war in protecting the harbors and fortifying the coast.
The facts involved are all a matter of record and are in effect agreed upon by the parties. The legal aspect of the case and its history are substantially as follows:
First claim. — July 27, 1861, 12 Stats., 276, the Congress enacted the following statute:
“ That the Secretary of the Treasury be, and he is hereby, directed, out of any money in the Treasury not otherwise appropriated, to pay to the governor of any State, or his duly authorized agent, the costs, charges, and expenses properly incurred by such State in enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States, to be settled upon proper vouchers to be filed and passed upon by the proper accounting officers of the Treasury.”
A joint resolution of Congress approved March 8,1862,12 Stats., 615, provides that the foregoing act shall be construed to apply to expenses incurred after as well as before the date of approval.
Pursuant to this, the State of Massachusetts armed and equipped volunteers for the service of the Federal Government during the Civil War and paid the cost, charges, and expenses incurred for that purpose. There being no money in the treasury of the State not otherwise appropriated, it became necessary for the State to raise the money required by borrowing it upon its bonds. Therefore, in pursuance of the act of its legislature approved May 21, 1861, it borrowed three millions of dollars on its bonds, which bore interest at the rate of 6 per cent per annum. They were payable beginning July 1,1871, and ending July 1,1876. Under the provisions of the act of its legislature approved April 25, 1862, the State borrowed $600,000 more on its bonds for the same purpose, and these bonds bore interest at the rate of 5 *318 per cent per annum and were payable July 1, 1871. These bonds were all denominated Union loan bonds.
The act of the legislature of the State of Massachusetts approved March 22,1862, provided that:
“ The interest and principal of all scrip or bonds of the Commonwealth of Massachuseets which have been or may hereafter be issued shall, when due, be paid in gold or silver coins.”
The Supreme Court in the case of New York v. United States, 160 U. S., 598, decided that that State was entitled to recover from the United States interest upon its bonds issued to defray the expenses to be incurred in raising troops for the national defense pursuant to the act of June 27, 1861. Whereupon the several States which had paid interest for tlufi purpose, including the State of Massachusetts, filed claims with the Treasury Department for interest so expended. The State of Masachusetts also included in her claim as a part thereof the premium expended upon coin for that purpose. This premium, paid for coin which paid the interest on bonds issued under the act of the legislature of April 25, 1862, for the sum of $600,000, as hereinbefore stated, was paid. But the claim for premium on coin used to pay the interest on the bonds issued in July, 1861, was rejected, the same being the sum of $886,389.68, and it is for the recovery of that sum so rejected that this suit is brought, together with the second claim, which is as follows:
Second claim. — The State of Massachusetts had expended the sum of $209,885.61 soon after the outbreak of the Civil War for the purpose of protecting the harbors and strengthening the fortifications on the coast and had filed a claim for said sum so expended with the accounting officers of the Government, but did not include in said claim any claim for interest.
On July 7,1884, Congress passed the following act:
“That the proper accounting officers of the Treasury Department be, and they are hereby, authorized and directed to examine the claim of the State of Massachusetts for expenses incurred and paid at the request of the President and Secretary of State, during the war, in protecting the harbors and strengthening the fortifications on the coast, now *319 on file with the third auditor, under the act of July twenty-seven, eighteen hundred and sixty-one (12 Stat., page two hundred and twenty-six) and report the amount to Congress.”
Pursuant to said act the accounting officers examined said claim and found that said sum had been expended for the purposes mentioned and reported the same to Congress, which was duly paid by appropriations for that purpose. October 10, 1902, the State filed another claim in the Treasury Department which included a claim for interest and premium paid for coin with which such interest was paid on money borrowed by the State on bonds issued under the act of its legislature of March 30, 1863, for the purpose of protecting the harbors and strengthening the fortifications on the coast, which said claim was rejected and has never been paid. This constitutes the second claim in the plaintiff’s petition.
We will now proceed to examine and discuss these claims in the order in which they are stated.
The first legal-tender act was passed by Congress February 25, 1862, 12 Stat., 345. This act was declared unconstitutional by the Supreme Court in the case of Hepburn v. Griswold, 8 Wallace, 606, which decision was overruled by the Supreme Court in the case of Knox v. Lee, 12 Wallace, 457, and the law decided to be constitutional. It will thus be seen that the first issue of the war-loan bonds by the State of Massachusetts was made several months before the passage of this act, at which time these bonds were only payable in coin.
The Legislature of Massachusetts passed an act March 22, 1862, making all of its bonds, both principal and interest theretofore issued or thereafter to be issued payable in coin. This act was passed less than a month after the passage of the legal tender act by Congress, at which time the legal tender issue of currency had depreciated very little in value. These historical facts are given as throwing some light upon the reason for this legislation by the State of Massachusetts. She had issued her bonds in good faith and upon the credit of the Commonwealth at a time when they were payable in coin.
*320 . These bonds had been taken probably by her own citizens, but there was nothing to show that they were designed to stop at home. The fair name of the Commonwealth, it was assumed, would give them currency in other States and in foreign lands as well, notwithstanding the only security behind them was the promise of the State to pay. Except in the case of a State holding some of the bonds and suing as such there was no legal remedy for the enforcement of the obligation by the courts. Upon the good credit of the State the bonds were taken and the money supplied and used to aid the United States. There can be no doubt that when the bonds were issued and subscribed for or purchased they were payable only in coin. By the terms of the Constitution the State could not make them payable in anything else. The State so thought that they were payable in coin, and the holders of the bonds had a right to think the same. The legal tender act reserved the right to pay interest on the bonds of the United States in coin, and the principal was payable in coin. If it was proper for the United States in determining what policy was best as to its obligations to declare that their bonds and the interest thereon should be payable in coin, can it be said to be improper for Massachusetts to follow so illustrious an example ? She had failed to express on the face of the bonds the real understanding when they were issued and purchased, namely, that they were payable in coin, but was it not proper, having regard to her own promise and her own fair name, that she should subsequently recognize her obligation by giving the assurance as solemnly as possible that her compact would be kept according to its original intention? Certainly among the duties of a State not the least of them is that the State shall be honest.
In this connection it may be well to call attention to what was done by the Federal Government to strengthen its credit after the close of the Civil War. While some of its bonds provided that the interest should be paid in coin, there was no specific statement as to the kind of money in which the principal should be paid. In order to keep faith with the holders of these bonds and do what it believed was the *321 understanding of the parties at the time they were issued, Congress enacted the following law, 16 Stat., 1:
“In order to remove any doubt as to the purpose of the Government to discharge all just obligations to the public creditors, and to settle conflicting questions and interpretations of the laws by virtue of which such obligations have been contracted, it is hereby provided and declared that the faith of the United States is solemnly pledged to the payment in coin or its equivalent * * *, of all the interest-bearing obligations of the United States, except in cases where the law authorizing the issue of any such obligation has expressly provided that the same may be paid in lawful money or other currency than gold and silver * *
By the enactment of this law the Federal Government did almost exactly what Massachusetts did under similar circumstances ; and this was done when coin was still at a high premium.
It is unthinkable that at this time anyone dreamed that the State of Massachusetts would ever have to prosecute a claim against the Federal Government for the interest paid on these bonds. The State of Massachusetts never could have had any such thought in view. She simply said to her creditors, “ You loaned me money upon these bonds of the standard of gold and silver, and though I may be enabled to pay for this loan by cheaper money I will never do so, but will pay you in kind.” Hence there is no room for the assumption that the State of Massachusetts in the enactment of this statute had any other object in view than that of keeping good faith with her creditors. If any motive can be ascribed to a municipal corporation, we think it is a presumption amounting to a conclusion that the State of Massachusetts thereby was only doing what she believed to be proper because it was honest, and had no intent of increasing the expense to the Federal Government in the raising and equipping of these troops.
It was urged by the defendants at the trial that, we are not allowed to look at this feature of the case, but must apply the hard letter of the law as though this suit was between individuals. Let us briefly examine that question. By the act of July 27, 1861, 12 Stat., 276, the Federal Gov- *322 ei’nment said to the sovereign State of Massachusetts (sovereign within certain limitations): “ If you will help us in this, our time of distress, by advancing funds to raise and equip troops for our service, we will refund to you all expense ‘ froferly incurred ’ for that purpose.” In order to respond to this call it was necessary for the State of Massachusetts to pledge her credit by the issuance of bonds at that time payable only in coin. Thereafter the Federal Government enacted a law which subsequent events showed would enable the State to pay this loan in cheaper money. Within 80 days after the passage of this law and when its unfortunate history had hardly begun, was it otherwise than “ proper ” for Massachusetts to say to her creditors on these and other bonds, “ You loaned us coin and we promise you that we will never compel you to take cheaper money in payment.”
The proper construction to be given by courts to the word “ proper ” as used in section 8 of Article I of the Constitution was decided in the case of United States v. Fisher, 2 Cranch, 358. The question for decision there was whether a statute making the United States a preferred creditor was constitutional. The court held that it was, and Chief Justice Marshall in his opinion said:
“In construing this clause it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specified power.
“ Where various systems might be adopted for that purpose, it might be said with respect to each that it was not necessary because the end might be obtained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution.” Id., 396.
The same subject came before the Supreme Court in the famous case of Knox v. Lee, already referred to, and there the court said:
“ It was, however, in McCulloch v. Maryland [4 Wheat., 416] that the fullest consideration was given to this clause of the Constitution granting auxiliary powers, and a construction adopted that has ever since been accepted as determining its true meaning. We shall not now go over the *323 ground there trodden. It is familiar to the legal profession and, indeed, to the whole country. Suffice it to say in that case it was finally settled that in the gift by the Constitution to Congress of authority to enact laws ‘necessary and proper ’ for the execution of all the powers created by it, the necessity spoken of is not to be understood as an absolute one. On the contrary, this court then held that the sound construction of the Constitution must allow to the National Legislature that discretion with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Said Chief Justice Marshall, in delivering the opinion of the court: ‘ Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.’ ” Id., 538.
There is another feature of this case which merits consideration. It is undisputed that Massachusetts in good faith actually spent the amount claimed in the payment of premium for coin for the payment of the interest on her bonds issued for money borrowed to answer the call for help by the Federal Government. As a matter of justice, ought not the statutes in question be given such a construction as to entitle the plaintiff to a judgment for this amount expended? In the New York ease Justice Harlan, speaking for the court, said that the statute of July 27, 1861, should be liberal^ construed, New York v. United States, 160 U. S., 620. He further said:
“On February 11, 1862, he [the Secretary of War] telegraphed : ‘ The Government will refund the State for the advances for troops as speedily as the Treasurer can obtain funds for that purpose.’ Liberally interpreted, it is clear that the acts of July 27, 1861, and March 8, 1862, created, on the part of the United States, an obligation to indemnify the State for any costs, charges, and expenses properly incurred for the purposes expressed in the act of 1861, the title of which shows that its object was ‘to indemnify the State for expenses incurred by them in defense of the United States.’ ”
After Massachusetts had expended this money in good faith regarding it as a “ proper ” expense for the purposes *324 for which it was required, is it for this court to inquire into the question as to whether the State might have raised the money at less expense? Can we be called upon to find whether she might have put bonds upon the market at par which bore a lower rate of interest than those which she issued ?
In Johnston's case, 124 U. S., 236, the court considered a provision in the captured or abandoned property act which provided that the Secretary of the Treasury should make “ such rules and regulations as are necessary to secure the proper and economical execution of the provisions of this act, and shall defray all expenses of such execution from the proceeds ” of sales, etc. The question was upon the meaning of the term “ the proper and economical execution ” in the statute. The court, while recognizing that the approval of the President was made essential to the validity of the rules and regulations, declared that the entire administration of the system devised by Congress was committed to the Secretary of the Treasury, and said (p. 249) :
“Upon him alone was imposed the responsibility, in the first instance, of making rules and regulations for the ‘proper and economical execution’ of the statutes in question, through agents whom he should designate. * * * Such authority was conferred upon the Secretary of the Treasury, subject to no other restriction than that the expenses charged upon the proceeds of sales be ‘proper and necessary,’ and be approved by him. But no rule was prescribed for its guidance in determining what expenses were to be regarded as of that character; for the reason, perhaps, that as each collection and sale of captured and abandoned property must depend upon its special circumstances, it was not practicable to establish a rule that would control every case.
“ As no expense could be charged against the proceeds of any sale except upon the approval of the Secretary of the Treasury, and as his discretion must have been exercised with reference to the special facts of each case, his approval of an account of expenses in relation to the collection and sale of any particular lot of captured and abandoned property should be deemed conclusive evidence that such expenses were proper and necessary, unless it appeared that the allowance of such expenses were procured by fraud, or that the expenses were incurred in violation of some positive statute or of public policy.”
*325 The principle thus announced is applicable here when we consider that no rubs were announced in the statute by which the expenses incurred by the several States should be determined. What was proper for one State might not apply in another. Each State had to determine for itself. The method for raising the money was left entirely to the State, and w-hat the State determined was a necessary and proper expense should be determinative of the question unless we find that the expenses incurred by the State were in violation of some statute or of public policy. There was no statute which forbade in terms a State making its bonds and the interest payable in coin, nor can it be said that it was contrary to public policy that this should be done, because it is well recognized that notwithstanding the legal-tender act parties could contract for the payment of their obligations in coin, and such contracts have been enforced. Bronson v. Rodes, 7 Wallace, 229; Trebilcock v. Wilson, 12 Wallace, 687.
In short, under the act of July 27, 1861, is this court called upon to question the policy of Massachusetts in her maimer of raising the money which it was necessary for her to raise to answer the call of the Federal Government? If we are not called upon to inquire into these things, are we allowed to question her right, at the time she did, to promise her bondholders that they should receive their interest in coin? It might well be remarked here that if the defendants had then borrowed the money for the purposes for which Massachusetts borrowed it the interest paid would have been more than it cost Massachusetts.
The case of Willard v. Tayloe, 8 Wallace, 557, was a suit brought by the plaintiff for the specific performance of a contract entered into in 1854. The suit was brought in 1864 and at a time when coin was at a very high premium (one dollar in gold being worth $1.80 in United States notes); and the court decreed a specific performance only on the condition that the plaintiff should pay the amount due by the terms of the contract in gold or silver coin.
While it is true • that in decreeing specific performance of contracts the court exercises large discretion as to its *326 terms, this decision seems to us clear justification for Massachusetts in providing, after the legal-tender act had been passed, that the interest on her bonds should be payable in coin. If a court of equity could decree that a contract entered into before the Civil War for the payment of money should be paid in coin before specific performance would be decreed, on the ground that it would be inequitable to do otherwise, why was not Massachusetts justified in saying that on a contract entered into with her bondholders for money payable in coin she should afterwards agree that the interest should be paid in coin, even though the law at that time would enable her to pay it in cheaper money ?
We now come to the consideration of the second claim in the plaintiff’s petition. The findings show that at the outbreak of the Civil War Massachusetts expended the sum of $209,885.61 for the purpose of protecting the harbors and strengthening the fortifications of the coast. July 7, 1884, Congress recognized this expenditure by passing an act referring this claim to the accounting officers of the Treasury Department and authorizing and directing them to examine the claim of Massachusetts for expenses so incurred. Pursuant to said ¡let, the State of Massachusetts filed its claim for the same, together with interest upon the bonds which she had issued for borrowing money for that purpose, together with the premium paid for coin with which such interest was paid. Thereupon the accounting officers allowed the claim for the principal on the bonds, but rejected the claim for interest and premium. Congress afterwards appropriated for the principal sum so expended by the State, but never made any appropriation for the interest and premium. We have been cited to no law of Congress promising to repay Massachusetts any part of the money so expended by her, from which it follows that however generous and patriotic this action on the part of the State may have been, she has no legal status in this court for the repayment of the same. The action of Congress in repaying her the principal sum expended was entirely voluntary and created no legal foundation for anything* more.
*327 It follows, from the foregoing, that the plaintiff should have judgment for the sum of $886,389.68 upon the first claim in the petition, and that the second claim should be dismissed, and it is so ordered.
Hat, Judge, DowNet, Judge, Booth, Judge, and Campbell, GTiief Justice, concur.